COMMODITY FUTURES TRADING
COMMISSION, Plaintiff,

v.

J. S. LOVE & ASSOCIATES OPTIONS,
LTD., et al., Defendants.

No. 76 Civ. 928.

United States District Court,
S. D. New York.

Aug. 12, 1976.

William R. Schief, Director, Div. of Enforcement of the Commodity Futures Trading Commission, Washington, D.C., for plaintiff; Donald S. Weiss, Michael R. Koblenz, Jerry W. Markham, Richard E. Nathan, Washington, D.C., of counsel.

Paskus, Gordon & Hyman, New York City, for defendant Winters; Robert R. Slaughter, New York City, of counsel.

## OPINION

BONSAL, District Judge.

Plaintiff Commodity Futures Trading Commission ("CFTC") commenced this action in this Court on February 26, 1976 by authority conferred in the Commodity Exchange Act, as amended in 1974 (7 U.S.C. § 2 *et seq.,* § 13a–1) (the "1974 Act") seeking preliminary and permanent injunctions against the eight named defendants whom the CFTC alleges violated the antifraud provisions of the 1974 Act (7 U.S.C. §§ 6c(b), 6m & 6o) and CFTC Rule 30.01 (17 C.F.R. § 30.01, 40 Fed.Reg. 26504 (June 24, 1975)), promulgated pursuant to § 4c(b) of the 1974 Act which provides for the CFTC's regulation of, *inter alia,* commodity options trading.

In March and April, 1976, each of the defendants other than Geoffrey Winters consented to the entry of an order of permanent injunction enjoining them from violating the antifraud sections of the 1974 Act, without admitting or denying the allegations in the complaint.[1]

Upon the CFTC's motion for a preliminary injunction against Winters for violation of § 4c(b) of the 1974 Act and Rule 30.01, a hearing was held on April 6, 9, 15 and 16, 1976. The CFTC called as witnesses James Spencer Love ("Love"), three customers of J. S. Love & Associates Options, Ltd. ("Options"),[2] two former sales representatives of Options,[3] two accountant-investigators of the CFTC staff,[4] and others who had dealt with Winters while he was working with Love at Options and at J. S. Love & Associates Consultants, Inc. ("Consultants"), Options' parent company.[5] In addition, the CFTC relies on several affidavits filed in support of its motion. Winters testified on his own behalf. At the hearing Winters moved for summary judgment dismissing the complaint.

Options, a New Jersey corporation incorporated on February 7, 1974 and wholly-

---

1. On March 1, 1976, permanent injunctions against J. S. Love & Associates Options Ltd., J. S. Love & Associates Consultants, Inc., and James Spencer Love, Jr. were issued and an order appointing a temporary receiver for the companies was issued on consent. Permanent injunctions on consent against Leonard Irwin Freedman and Melvin Cantor were issued on March 3, 1976 and against Arlene Karian on March 10, 1976. On April 9, 1976, after the first day of the hearing held on the CFTC's motion for a preliminary injunction, Charles Lemieux consented to the entry of an order of permanent injunction. On March 11, 1976 the companies filed voluntary petitions in bankruptcy in this Court, and on April 13, 1976, Paul Krohn, Esq. was appointed as trustee for each company by Bankruptcy Judge John Galgay.

2. Joseph Vogel; Edward N. Davidson; and Richard Rohrbacher.

3. Harvey Neiblum and John Moriarty.

4. Maryann Bernadet Chiacchere, a CFTC investigator; and Adelaide Blitzer, a CFTC accountant-investigator.

5. Harry Koenig, senior vice president of AC & R Advertising Company in charge of finance and recordkeeping; Leo Billa, vice president of Coolidge Company, an enterprise engaged in the business of distributing mailing lists to other persons who use them in mail solicitations; and John Berwyn Evans, a former account executive at AC & R Advertising Company in charge of Love's companies' advertising accounts.

owned by Consultants, was primarily engaged in the business of offering and selling to public investors "London commodity options".[6] Options' principal place of business was New York City and during 1975 and 1976 it established and maintained branch offices located across the country.[7] Consultants was a New Jersey corporation incorporated in May, 1973 with its principal office in New York City (apparently at the same address as Options). Love was the sole shareholder of Consultants. Consultants conducted business in the name of "J. S. Love & Associates" and, among other things, sold silver bullion and coins, and prepared and distributed to the public commodities market newsletters such as "The Love Letter", "Economic Realities", and "Gold and Economic Predictors". The business and finances of Options and Consultants (hereinafter referred to as "Love's companies") appear to have been highly integrated. Love was the principal operating officer of both companies. On March 11, 1976, Love's companies filed voluntary petitions in bankruptcy in this Court and a trustee was appointed.[8]

*The Promotional Literature.*—The CFTC contends that during Winters' association with Love's companies, pieces of promotional literature were distributed to the public to encourage purchases of commodity options through Love's companies, and that this literature was deceptive and misleading, including: a brochure entitled "Trading London Commodity Options" (Pltff.'s Exh. 4); a glossy brochure entitled "Options in London commodity Futures" (Pltff.'s Exh. 2); a brochure entitled "Anyone Can Make a Million" (Pltff.'s Exh. 3); an excerpt from a publication called *Money Tree*, Vol. V, No. 5 (May, 1975) (Pltff.'s Exh. 1); an article published in the magazine *The O–T–C Market Chronicle*, Vol. 8, No. 45 (Nov. 28, 1974) (Pltff.'s Exh. 8); and a letter on J. S. Love & Associates letterhead entitled "How Would You Like to Eliminate Margin Calls When Trading Commodities?" (Pltff.'s Exh. 9). In addition, the CFTC contends that promotional advertisements placed by "J. S. Love & Associates" in *The New York Times* Sunday editions of June 29, 1975 and July 20, 1975 (Pltff.'s Exhs. 13 & 14)[9] and in an Illinois

6. A "London commodity option" is a contractual right to buy ("to go long", referred to as a "call option") or to sell ("to short", referred to as a "put option") a specified futures contract traded on the London Markets for a particular commodity, at a specified price (referred to as the "strike" price) within a specified period of time (on or before the "declaration date"). A "double option" gives the purchaser of the option either a put or a call option, but not both, and the election is to be made at or before the declaration date. The option must be "exercised" by the declaration date or is it considered "abandoned." The purchaser of an option pays a "premium" which will vary in amount depending, *inter alia*, on the option's duration at the time of purchase and the market conditions as to the underlying commodity. In addition, the purchaser must pay a broker's fee at the time of purchase of the option, and another fee if the option is exercised. If the options purchaser fails to exercise the option, (thus abandoning the option), he loses his option premium.

There are two London commodity markets on which options are traded. "Soft" commodities, such as cocoa, grain, coffee, rubber and sugar and options thereon, are traded through the International Commodities Clearing House ("ICCH"). "Hard" commodities, such as silver, gold and other metals, and options on these

commodities are traded on the London Metal Exchange ("LME"). The purchases on behalf of customers of J. S. Love & Associates Options Ltd. ("Options") of soft commodity options largely were made on the ICCH by the clearing member firm of Kreglinger and Masurel, a London broker. The purchases were made in the name of Options and were reflected in an omnibus account in Options' name. The omnibus account also reflected options contracts purchased by Options for its own account, and by Options sales representatives for their personal accounts.

7. The "branch" offices were located in Syracuse and Bayside, New York; Kansas City, Missouri; San Diego and Los Angeles, California; Columbus, Ohio; Chicago, Illinois; Boston, Massachusetts; Washington, D. C.; Detroit, Michigan; and Seattle, Washington.

8. *See* note 1 *supra.*

9. Each of the advertisements were similar to the July 20, 1975 *Times* advertisement, which read as follows:

"75.2% OF OUR CUSTOMERS' LONDON COMMODITY OPTIONS WERE PROFITABLE THIS YEAR.*·

"London commodity options are a little-known but powerful investment tool that has

newspaper in September, 1975 (*see* Pltff.'s Exhs. 31 & 33) (hereinafter referred to as the "*Times* advertisement") were deceptive and misleading.

Based upon a review of the promotional literature and the *Times* advertisement described above, the testimony of Adelaide Blitzer, an accountant-investigator for the CFTC with experience in the operation of the commodity futures and options markets, and the testimony and affidavits of various customers of Options, the Court concludes that many of the pieces of the promotional literature written by representatives of Love's companies and the *Times* advertisement contained deceptive and misleading statements. For example, in contrast to the impression conveyed by the promotional literature, no "guarantees" of payment or satisfaction are extended to customers of Options by the London firms, Options, or the clearing house of the London exchanges; guarantees of completion of the options contracts are extended only by the International Commodity Clearing House ("ICCH") on "soft" commodities [10] and only to member firms of the ICCH. Neither Options nor its customers can assert rights under these guarantees. No options are purchased in the customer's name; rather the options contracts are purchased by a London broker in the name and for the account of Options. Thus recovery by Options' customers of any profits on these options is contingent upon transfer of funds by Options to the customers' accounts in the United States.

Neither the promotional literature nor the *Times* advertisement reveals (1) that the profit earned on an options contract would be affected by fluctuations in the foreign currency exchange rates; (2) that many of the salesmen of Options had had no experience in the commodity options market prior to working at Options; and (3) that the price charged to customers on options was up to 40% higher than that charged by the London brokers. In addition, it appears that contrary to statements in the promotional literature, no financial support is provided to the London commodity exchanges by the Bank of England. As to statements in the *Times* advertisement that "75.2% of [Options'] customers' London commodity options were profitable this year" and that "profits of even up to 700% with limited risk" were possible, these assertions are misleading in that they fail to adequately explain the data on which they are based and omit to state other relevant facts. Finally, and significantly, the promotional literature and the *Times* advertisement do not state that investment in commodity options is often highly specula-

---

earned profits for many J. S. Love customers who acted on our commodity advice—profits of even up to 700%, with limited risk. These options are traded on London commodity exchanges, institutions with histories of over one hundred years. These institutions are backed by the Bank of England, with capital reserves of seven billion dollars. The options come with written *guarantees* of payment satisfaction.

The best-known method of trading in commodities is the futures contract. But there is unknown inherent risk in the futures contract known as margin calls, which can be overwhelming: if the investor can't pay immediately, his investment is sold out or even wiped out.

On the other hand, when an investor buys an option on a commodity future, *his risk is* limited to the cost of the option; he does not have the threat of margin calls hanging over his head. And the options investor still has substantial leverage, and the opportunity of making large profits.

For example, back in 1973 J. S. Love started recommending sugar calls when sugar was only 9¢ a pound. While sugar went to 66¢ during '74, a $5,405, sugar option delivered $40,003. (And other sugar options bought on the price downturn *made* still more profits.)

J. S. Love & Associates Options, Ltd., is America's largest dealer in London commodity options. We have instantaneous wire connections to London, fully-computerized account records, and a research division that has an outstanding record of accuracy in its predictions.

Call any day including Sunday and learn how to take advantage of this great opportunity. Call (212) 355–3700, or send in the *coupon below.*"

\* This is based on options bought in 1975 which have either expired or been exercised.

**10.** *See* note 6 *supra.*

tive and is usually engaged in by sophisticated investors. *See* "Commodity Trading," *Business Week*, Mar. 15, 1976, at 50–57; Shakin, B., "Commodities Options", *Barron's*, Jan. 27, 1975, at 11–12.

## VIOLATION OF RULE 30.01

*The Parties' Contentions.*—The complaint alleges that Winters, as vice president of Options with "responsibility for supervising and training sales persons at Options . . and . . . responsibility for establishing, maintaining and supervising the operations of branch offices of Options" participated in an allegedly "high-pressure sales campaign to offer and sell commodity options to public investors . . . through the use of deceptive advertisements, brochures, . . . and other promotional literature" (Complaint ¶ 11(a) *et seq.*) and that Winters "failed to supervise properly and implement appropriate supervisory procedures to prevent salespersons of Options . . . from engaging in [the various] fraudulent and deceptive sales practices [alleged]." (Complaint ¶ 11(m).)

Winters denies these allegations. He contends that neither the complaint nor the evidence at the hearing establishes that he performed acts constituting violations of Rule 30.01 since the Rule "proscribes only wilful misconduct"; that securities law principles do not apply to interpret Rule 30.01; and that, in any event, no violations of Rule 30.01 have been proven. Winters also moves for summary judgment dismissing the complaint on these grounds.

*The Evidence.*—Winters testified that from 1968 to 1974 he worked at four different member firms of the New York Stock Exchange as a registered representative; that in 1974 he established a financial consulting and public relations firm, G. J. Winters & Associates, Inc.; that in July, 1974 the firm agreed to take on Love's companies as clients; and that Winters did not trade commodity futures or options for himself or for any of Love's companies' customers. Winters testified that in July, 1974 Love sought to "broaden his company and nationalize it" and through advertising to gain greater recognition in the commodity options business; that, pursuant to Winters' suggestion, Love began bi-weekly distribution to his customers and prospective customers of a market newsletter entitled "The Love Letter"; that in December, 1974 Winters agreed to devote 80% of his time to Love's companies to implement a "more aggressive plan . . . [and] to really get down to putting together the branch office[s] and developing broker-dealer relations." For these services Love paid Winters $3,000 (and later $4,000) per month, and provided office space and secretarial assistance.

The evidence shows that in March, 1975 Winters was made a senior vice president of Consultants; that as of about August, 1975 and thereafter, in Love's absences Winters acted as the principal officer of Love's companies and had check-signing authority for Options' accounts; that for several months starting in April, 1975 he acted as sales manager for Options' New York office; that he often distributed the names for new customers to the Options sales representatives; that the sales representatives thought of Winters as the person to whom they directly reported; that Winters approved and often signed sales representatives' pay and commission checks; that he advertised for new personnel and interviewed applicants for positions as sales representatives and sales manager for the Options New York office; and that he taught telephone sales techniques during training sessions to new Options sales representatives.

Winters and Love testified that upon Winters' recommendation Love selected A C & R Advertising Inc. ("AC&R") as the advertising agency for his companies; that Winters signed the contracts dated June 16, 1975 engaging AC&R's services; and that on Winters' recommendation the form of Love's companies' advertising was changed. The testimony of Love, Winters and the witnesses from AC&R indicated that Winters was the liaison between Love's companies and AC&R; that Winters authorized AC&R to place advertisements in the news-

papers to attract customers; and that the *Times* advertisement described above (*see* note 9 *supra*) was written from information provided by Winters to AC&R, although it appears that Winters did not participate in its preparation. Winters participated in the discussions regarding the layout of the *Times* advertisement and questioned the use of the word "guarantees", but relied on the approval of counsel for AC&R and Love's companies that the wording was satisfactory. It appears that Winters did not investigate the accuracy of the statements made in the brochures or the *Times* advertisement.

Love also testified that one of Winters' primary functions was to set up "branch" offices for Love's companies. Winters testified that he would visit each potential branch office, interview the personnel there, and then make recommendations to Love as to whether Love should make a contract. Winters stated that after establishing each branch office, he had responsibility to see it operated according to the terms of its contract with Love. Winters had check-signing authority on accounts for each of the branch offices and it appears that he was responsible for distribution to these offices of the promotional materials used by the sales representatives.

Love and Winters testified that Winters did not see financial statements of Love's companies and was not privy to the finances of the companies, although he had inquired about such information from Love. It appears that he did see financial data in connection with sales representatives' commissions and the firm's trading (or "house") account in London, through which the customers' options were handled. The evidence indicates that the allegedly deceptive promotional literature was written by persons other than Winters and were written prior to Winters' association with Love's companies.

Winters terminated his employment with Love's companies in February, 1976, prior to the commencement of this action.

*Rule 30.01.*—It appears that this is the first case requiring judicial interpretation of Rule 30.01. Winters contends that to establish a violation under this Rule the CFTC must allege and prove "wilful misconduct", specifically that he, "knowing that the advertisements were deceptive, knowing that the sales practices were impermissible[,] *wilfully* engaged in such conduct to deceive purchasers of commodity options." Deft's Mem. at 12.[11] The CFTC contends that there is no such requirement, and that the Rule should be interpreted broadly to effect its prophylactic purpose.

In 1974, Congress enacted the Commodity Futures Trading Commission Act, Pub.L. 93–463, 88 Stat. 1389 (Oct. 23, 1974), codified at 7 U.S.C. § 2 *et seq.,* to amend the Commodity Exchange Act of 1936 (the "1936 Act") then in effect. Section 4c(b) of the 1974 Act permitted trading of options on certain commodities, including those handled by Love's companies, so long as the trading was not done "contrary to any rule, regulation, or order of the [CFTC] prohibiting any such transaction [and was done in conformity with] such terms and conditions as the [CFTC] shall prescribe." 7 U.S.C. § 6c(b). Thus, as to these options, Congress delegated regulatory responsibility to the CFTC.

On June 24, 1975, pursuant to the authority conferred in § 4c(b), the CFTC adopted an antifraud rule, Rule 30.01 (17 C.F.R. § 30.01, 40 Fed.Reg. 26505–06 (June 24, 1975)), which provides:

> "It shall be unlawful for any person, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly,
>
> "(a) To cheat or defraud or attempt to cheat or defraud any other person;

---

11. Winters' apparent contention that Rule 30.01 is promulgated pursuant to § 4b of the 1974 Act is misplaced. Rule 30.01 is founded on the CFTC's authority under § 4c(b), which does not impose any restrictions on how the CFTC may regulate (or even prohibit) trading in options on the relevant commodities. *Cf. Udall v. Tallman,* 380 U.S. 1, 16–18, 85 S.Ct. 792, 13 L.Ed.2d 616 (1963). *See* 40 Fed.Reg. 18187 (Apr. 25, 1975); 40 Fed.Reg. 26504 (June 24, 1975).

"(b) To make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof;

"(c) To deceive or attempt to deceive any other person by any means whatsoever;

in or in connection with an offer to enter into, the entry into or the confirmation of the execution of, any transaction involving any [of certain specified commodities] which is or is held out to be of the character of, or is commonly known . . . as an 'option' . . . ."

■ The wording of Rule 30.01 is general. Consequently, the legislative and administrative intent are relevant to a proper understanding of the Rule. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945).[12]

The expansion of the commodity futures market has been accompanied by a corresponding growth in trading in commodity options. Abuses and frauds discovered in this area led Congress, in the 1936 Act, to ban options on all commodities regulated under that Act. *See* "Recommended Policies on Commodity Option Transactions, Report of the Advisory Committee on the Definition and Regulation of Market Instruments to the Commodity Futures Trading Commission," Exh. I, at 94 *et seq.* (July 6, 1976). Improper practices in the trading of options on other commodities was one of the factors leading to passage of Commodity Futures Trading Commission Act of 1974 amending the 1936 Act. *See* "Note—The Role of The Commodity Futures Trading Commission Under the Commodity Futures Trading Commission Act of 1974," 73 Mich. L.Rev. 710, 722 n. 82 (1975).[13] Because trading in commodity options generally is regarded as speculative and complex (*see* 73 Mich.L.Rev. at 720–25; Bromberg, A.R., "Commodities Law and Securities Law," 1 J. of Corp. L. 217, 257 (1976)), a ban on all commodity options was proposed. 73 Mich. L.Rev. at 722 & n. 83. In the 1974 Act, Congress compromised by continuing the ban on options on the commodities which had been regulated under the 1936 Act, while delegating to the CFTC the regulation of other types of commodity options, such as those traded by Love's companies. *Id.* at 722 & n. 84; Bromberg, *supra* at 311. As stated in the Senate Committee's Report on the 1974 amendments to the 1936 Act, Congress sought

"to establish a regulatory authority in the commodity field similar to the Securities and Exchange Commission and to give that authority a strong law which [would] enable it to regulate . . . in the public interest." Senate Comm. Rep. No. 93–1131, 3 U.S.Code Cong. & Admin. News 5843, 5860 (1974).

In drafting Rule 30.01 the CFTC originally proposed to adopt the language of Rule 10b–5, promulgated by the Securities and Exchange Commission ("SEC"). *See* 40 Fed.Reg. 18187 (Apr. 25, 1975). However, after consideration of the comments received in response to this proposal, the CFTC stated in adopting the form quoted above, that while it

"believe[d] that the interpretive approach taken by the courts with respect to Rule 10b–5 would generally be satisfactory if applied to prevent deceptive acts and practices in connection with transactions covered by the options and foreign mar-

---

12. "[T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945).

13. *See* cases based on "naked option schemes", options sold without being backed by futures contracts or actual ownership of the commodity: *SEC v. Goldstein, Samuelson, Inc.,* Civ. No. 73–472, Complaint (C.D.Cal., filed Mar. 5, 1973) (citations to the SEC summaries of the progress of the case cited in Bromberg, A.R., "Commodities Law & Securities Law," 1 *J. of Corp. L.* 217, 257 n. 154). *See* Schobel, Jr., J. and Markham, J. W., "Commodities Options—A New Industry or Another Debacle?", BNA Special Supplement, BNA Sec.Reg. & L.Rep., N. 347 (Apr. 7, 1976).

ket antifraud rules, . . . [it] feels it would be inappropriate generally to apply the language of Rule 10b–5 to the commodity futures or other transactions regulated under the Commodity Exchange Act, as amended, since this might invite an uncritical application of security law principles and practices." 40 Fed.Reg. at 26505 (footnote omitted).

Moreover, the CFTC sought to maintain "uniformity of rules in the commodity area." *Id.* In adopting this language, however, the CFTC specifically noted its view that

"[t]he operative language of the antifraud provision contained in section 4b of the [1974 Act], 7 U.S.C. § 6b, is no less broad than Rule 10b–5 with respect to misrepresentations and deceptive acts and practices."

*Id.*

The CFTC added in a footnote that

"a failure to disclose information [also] may operate as a fraud or deceit with respect to commodity transactions in certain circumstances,"

but that the CFTC wanted a case-by-case application of the securities law principles. *Id.* at n. 1.

In further explaining Rule 30.01, the CFTC noted:

"In the rules it has adopted, the Commission has not used the concept of willful behavior, which is reflected in the statutory language [of § 4b]," [14]

and distinguished two prior cases which had required proof of willfulness to establish a violation.[15] *Id.* at n. 2.

In addition, the Supreme Court has stated that it is " 'essential . . . that the highest ethical standards prevail' in every facet of the securities industry, *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186–87, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963), citing and quoting *Silver v. New York Stock Exchange,* 373 U.S. 341, 366, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). This principle is equally applicable to the commodity options industry.

■■■ Accordingly, the Court concludes that the history of the 1974 Act and Rule 30.01 and the wording of the Rule [16] refute Winters' contention that a violation of Rule 30.01 cannot be established absent "wilful misconduct", as he defines the term, at least in the context of an enforcement proceeding such as this. In this kind of proceeding, Rule 30.01 is to be interpreted broadly and flexibly, giving effect to the

---

**14.** Section 4b of the 1974 Act, which provides for criminal penalties, cf., *United States v. Grady,* 225 F.2d 410 (7th Cir.), *cert. denied,* 350 U.S. 896, 76 S.Ct. 155, 100 L.Ed. 788 (1955), reads in relevant part that "It shall be unlawful" for certain persons

"in connection with . . . the making of [certain] contract[s] of sale of any commodity . . . or [certain futures contracts with] any other person . . .—
"(A) to cheat or defraud or attempt to cheat or defraud such other person;
"(B) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;
"(C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person; or
"(D) to bucket such order, or to fill such order by offset against the order or orders of

any other person, or willfully and knowingly and without the prior consent of such person to become the buyer in respect to any selling order of such person, or become the seller in respect to any buying order of such person."

**15.** *Economou v. U.S. Dep't of Agriculture,* 494 F.2d 519 (2d Cir. 1974) (per curiam); *McCurnin v. Kohlmeyer & Co.,* 347 F.Supp. 573, 575–76 (E.D.La.1972), *aff'd,* 477 F.2d 113 (5th Cir. 1973).

**16.** While dictionary definitions of the words used in Rule 30.01 may assist in its interpretation, and some of the words such as "cheat" and "deceive" might be construed as implying intent to do harm by the actor (*see McCurnin v. Kohlmeyer & Co.,* 347 F.Supp. 573, 575–76 (E.D.La.1972)), it is unwise to "make a fortress out of [a] dictionary." *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.) (Hand, J.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945). "[S]tatutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." *Id.*

CFTC's purposeful omission of the word "willful". Moreover, consideration of securities law cases is appropriate in delineating the scope of this Rule.

■ *Application of Rule 30.01 to Winters.* —For over one year, Winters held a responsible position at Love's companies, both in title and in the duties he performed. He participated in the hiring, training and operation of the Options sales force in the New York office, and in the establishment and oversight of the branch offices. At best, Winters knew there was much about Love's companies' operations and the London commodity options industry that he did not understand. Winters did not investigate, or pursue any inquiry he might have made, as to the basis for or the accuracy of the statements made in the promotional literature and the *Times* advertisement. Nevertheless, he caused this promotional matter to be disseminated to potential and actual customers of Options. In these circumstances, this conduct is a violation of Rule 30.01, subsection (b), which makes it unlawful "to make or cause to be made to any person any false report or statement thereof . . . in or in connection with an offer to enter into . . . any transaction involving . . . an 'option' ", and subsection (c), which makes it "unlawful for any person" to "deceive . . . any other person by any means whatsoever," whether Winters' conduct is considered "negligence" or "lack of due diligence".

Winters' alleged reliance on counsel's advice as to the *Times* advertisement does not preclude these findings. *See SEC v. Harwyn Industries Corp.,* 326 F.Supp. 943, 954 (S.D.N.Y.1971). In any event, the *Times* advertisement was only one part of the overall pattern of conduct.

■ This conclusion is supported by analogy to SEC Rule 10b–5 which, in enforcement proceedings for equitable and prophylactic relief, proscribes "negligent" conduct consisting of failure to disclose material facts, when there is reason to know the truth. *See SEC v. Spectrum,* 489 F.2d 535, 541 (2d Cir. 1973); *Gross v. SEC,* 418 F.2d 103 (2d Cir. 1969); *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 855 (2d Cir. 1968), cert. denied sub nom., *Kline v. SEC,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); *SEC v. Lum's, Inc.,* 365 F.Supp. 1046, 1057–58 (S.D.N.Y.1973). *Cf. SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1096–97 (2d Cir. 1972). Moreover, the Court of Appeals has held under Rule 10b–5 that brokers and salesmen have a duty to customers to investigate to determine an "adequate basis for the opinions . . . render[ed]." *Hanly v. SEC,* 415 F.2d 589, 596 (2d Cir. 1969). Winters, performing duties designed to attract new customers for Love's companies, may be held to a similar standard.

Indeed, as a former registered representative with six years' experience in the securities industry, and as a person with sufficient expertise to do financial consulting, Winters recognized there is a duty of disclosure of material facts to customers. He attended numerous meetings regarding the *Times* advertisement and questioned certain aspects of the layout and wording. However, he did not pursue these inquiries or analyze the statements in the promotional literature.

Accordingly, presented here is a situation in which failure to disclose information and to correct deceptive and misleading statements disseminated to Love's companies' customers constitutes a violation of Rule 30.01.[17] However, the Court declines, on the record presented, to find Winters violated Rule 30.01 in failing to supervise the Options salesmen or on any theory of *respondeat superior* for salesmen's acts or statements. *Compare SEC v. Geon Industries, Inc.,* 531 F.2d 39, 51–52 (2d Cir. 1976); *SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 811–13 (2d Cir. 1975) (agency principles); *SEC v. Lum's, Inc.,* 365 F.Supp. at 1064–65.

17. There appears no dispute that the interstate commerce element of Rule 30.01 has been satisfied in this case.

### THE APPROPRIATE RELIEF

█ The CFTC has brought this action pursuant to the authority granted in § 13a–1, which provides that:

"Whenever it shall appear to the [CFTC] that any . . . person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order thereunder, . . . the [CFTC] may bring an action in the proper district court of the United States . . . to enjoin such act or practice, or to enforce compliance with this chapter, or any rule, regulation or order thereunder . . . . Upon a proper showing, a permanent or temporary injunction . . . shall be granted without bond."

In all material respects this provision is the same as that in the Securities Exchange Act of 1934, § 21(e), 15 U.S.C. § 78u(e), and in the Securities Act of 1933, § 20(b), 15 U.S.C. § 77t(b). Accordingly, case law developed under the securities laws is pertinent to cases under § 13a–1 of the Act, such as this one.

The Court of Appeals recently reaffirmed that in SEC actions which seek injunctions which are "creatures of statute", no proof of irreparable injury is necessary. *SEC v. Management Dynamics, Inc.,* 515 F.2d at 808. In order to make the requisite "proper showing", the enforcement agency must show that the defendant's past behavior gives indication that without injunctive measures he might again engage in such activities. *Id.* at 807; *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d at 1100; *SEC v. Texas Gulf Sulphur Co.,* 312 F.Supp. 77, 87–88 (S.D.N.Y.1970). The Court is to consider the "totality of the circumstances" and whether " 'there is a reasonable expectation that the defendants will thwart the policy of the [securities laws] by engaging in activities proscribed thereby.' " *SEC v. Texas Gulf Sulphur Co.,* 312 F.Supp. at 87; *SEC v. Culpepper,* 270 F.2d 241, 249 (2d Cir. 1959). *See SEC v. Management Dynamics, Inc.,* 515 F.2d at 807. The defendant is entitled to an opportunity to "demonstrate

that 'there is no reasonable expectation that the wrong will be repeated.' " *See. United States v. W. T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); *SEC v. Culpepper,* 270 F.2d at 249–50. While "cessation of violations . . . is no bar to the issuance of an injunction," *Hecht Co. v. Bowles,* 321 U.S. 321, 327, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944), principles of equity still play a strong part in the decision to issue the injunction. *See SEC v. Texas Gulf Sulphur Co.,* 312 F.Supp. at 87. As stated by the Court of Appeals:

"We scarcely mean to imply that judges are free to set to one side all notions of fairness because it is the SEC, rather than a private litigant, which has stepped into court. . . . '[I]n deciding whether to grant injunctive relief, a district court is called upon to assess all those considerations of fairness that have been the traditional concern of equity courts.' " *SEC v. Management Dynamics, Inc.,* 515 F.2d at 808 (citations omitted).

█ After consideration of the record, Winters' testimony at the hearing, and other circumstances presented, the Court concludes in the exercise of its discretion that a preliminary injunction against Winters is unwarranted. *See United States v. W. T. Grant Co.,* 345 U.S. at 633, 73 S.Ct. 894; *SEC v. Texas Gulf Sulphur Co.,* 312 F.Supp. at 87–88. Prior to June 24, 1975, when Rule 30.01 was published and became effective, London commodity options had been unregulated by Congress. Rule 30.01 did not take effect until six months after Winters had been with Love's companies. The Rule's wording is general, and no regulations were promulgated specifically as to advertising by commodity options firms. Winters, who did not write the promotional literature or the *Times* advertisement, testified that he believed Love's companies' advertising statements were true and that they were similar to those of Love's competitors. Also, Winters' reliance on counsel's opinion as to the *Times* advertisement, while not dispositive, can be taken into account. *See SEC v. Lum's, Inc.,* 365

F.Supp. at 1066; *SEC v. Harwyn Industries Corp.*, 326 F.Supp. at 955–56. Winters is now on notice that he is responsible for his conduct which constituted a violation of Rule 30.01. Consequently, the Court finds that the purposes served by issuance of a preliminary injunction are outweighed by the "harmful impact on the personal reputation . . . and legitimate business activities" of the defendant. *SEC v. Harwyn Industries Corp.*, 326 F.Supp. at 957.

Accordingly, the CFTC's motion for a preliminary injunction against Winters is denied.

In light of the foregoing, Winters' motion for summary judgment is also denied.

The foregoing constitutes the Court's findings of fact and conclusions of law.

It is so ordered.