WILSON, Circuit Judge,
dissenting:
I am troubled by the majority’s holding, because it provides no useful guidance to commodities brokerage firms as to how to bring their solicitation and advertising activities into compliance with the law. Our case law already contains a confusing and vague definition of what constitutes “fraud” under the Commodities Exchange Act (CEA) and Commission Rule 33.10; the majority’s opinion only adds to the uncertainty of this body of law. On this record, I would have found that R.J. Fitz *1337 gerald. & Co. (RJFCO) was not involved in fraudulent solicitations, nor did they attempt to cheat, defraud, or deceive clients under Commission Rule 33.10. Therefore, I respectfully dissent.
DISCUSSION
The majority contends that the statements made by RJFCO in the commercial and the promotional seminar “directly contravene the legal principles established in prior commodities fraud cases.” The majority cites the following four cases to support its finding that RJFCO committed fraud: (1) CFTC v. Trinity Fin. Group, Inc., [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,179, 1997 WL 820970 (CFTC Sept. 29, 1997), aff'd in relevant part and vacated in part, CFTC v. Sidoti 178 F.3d 1132 (11th Cir.1999); (2) In re JCC, Inc., [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,-080 (CFTC May 12, 1994), aff'd, JCC, Inc. v. CFTC, 63 F.3d 1557 (11th Cir.1995); (3) Bishop v. First Investors Group of the Palm Beaches, Inc., [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,-004 (CFTC Mar. 26, 1997); (4) In re Staryk, [1994-1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,701 (CFTC June 5, 1996), aff'd in relevant part arid vacated in part, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,206, 1997 WL 840840 (CFTC Dec. 18, 1997).
A comparison of the facts of these four eases to the facts in this case should lead to the conclusion that RJFCO’s statements are dissimilar and legally distinguishable from all four cases.
I. RJFCO did not falsely misrepresent profit potential or claim that seasonal trends practically guaranteed profits.
It is clear from prior case law that a broker registered as an associated person (AP) must not misrepresent the likelihood of profit to any current or prospective customer. See, e.g., In re JCC, Inc., [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 41,576; In re Staryk, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 45,809. As the commission in In re JCC, Inc. stated, “[w]hen the language of a solicitation obscures the important distinction between the possibility of substantial profit and the probability it will .be earned, it is likely to be materially misleading to customers.” [1992-1994 Transfer Binder] Comm. Fut. L.. Rep. (CCH) at 41,576 n. 23 (emphasis added). More specifically, an AP must not represent that an anticipated seasonal trend, such as winter and summer, will “almost guarantee profits'.” Sidoti 178 F.3d at 1135-36.
For example, the APs in Trinity Financial Group, Inc. “misrepresented the profit potential of ... commodity options by falsely telling ... customers that .they were practically guaranteed to make a profit because of the cyclical and/or seasonal nature of the gasoline and heating oil markets.” [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 45,628. One. AP told a customer “that heating oil was cyclical in nature and that this was a pattern that he had seen over the past ten years, and that he had consistently made money on it.” Id. Another AP said that “heating oil always went up during the winter and that if he invested $10,000, he would make $60,000 to $70,000 by the end of the year.” Id. Yet another AP .said that-in the heating oil market “the trend is to buy in the summer months and sell it in the winter months. And he made the analogy, ... when do you buy a fur coat? Do you buy a fur coat in the winter months or do you buy it in the summer months?”

Id.

*1338 In In re JCC, Inc., the scripts given to the APs “often emphasized historical market moves that earned customers substantial profits, and encouraged customers to anticipate similar profits.” [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 41,576. For example, one customer related that an AP told him that
I should purchase a position in heating oil, that it was a sure thing that every Fall heating oil goes up. It was guaranteed that I’d make $3,000 by Spring, no ifs, ands, or buts. It was a sure thing.... After [the heating oil losses], he called me with the same story about crude oil and that time I was going to make $8,000.
Id. The commission in In re JCC, Inc. held that,
[g]iven the distorted view of the likelihood of profit and loss fostered by the blatant misrepresentations discussed above, such history-based statements do not escape our scrutiny merely because such a profit was possible, indeed, had actually been earned at a particular historical point ... Without additional historical context, such as the frequency of the described market movement and whether market fundamentals or related circumstances have changed since the last occurrence, and some cautionary language about the difficulty of catching a market trend and escaping its reversal, customers can be misled by undue emphasis on such historical successes. In the circumstances of this ease, we find that JCC and EDCO’s focus on such successes helped deceive their customers about the fundamental nature of the futures markets.

Id.

In Bishop, the customer was induced into opening an account as a result of an AP’s statements that based upon the history of the heating oil market, profits were “probable.” [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 44,841. The AP said that “based on the history of the heating oil market for the past 12 years, I could make a lot of money in heating oil.... [P]eople had made a lot of money buying before prices rose and selling after they had risen.” Id. The commission found that “[t]hese types of representations made by [an AP] provide the deceptive message that the predictable nature of the seasonal demand and price trends essentially assured the likelihood of dramatic profits and far outweighed the risk of loss generally associated with trading commodity options.” Id. What made the AP’s statements so deceptive as to be “misleading half-truths” was the fact that the AP “failed to disclose that a seasonal increase in the demand for heating oil would not necessarily result in the increased value of a heating oil option, because the market had already factored seasonal demand into the price of an option.” Id.
Lastly, in In re Staryk, an AP represented to his clients that “given the historical seasonal pricing trends in gasoline and heating oil, speculation in gasoline and heating oil options is significantly less risky and more likely to result in profits than speculation in those options tied to non-seasonal markets.” [1994-1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 43.928. In fact, the AP claimed to customers that “the likelihood of the gasoline market going down in the summer is similar to the likelihood that someone would cancel the Fourth of July, cancel Memorial Day, or cancel summer vacations in schools in North America and in Europe.” Id. at 43.929. The administrative law judge determined that those representations were “blatantly false”:
*1339 seasonal shifts in demand (and the corresponding price changes) that generally characterize the physical markets for gasoline and heating oil, do not reduce the risks involved in trading energy options. No advantage is gained from knowledge of these seasonal patterns. ...
... It is only when unexpected events occur, including higher or lower than expected demand for gasoline, that an option may become profitable.
Id. at 43,930-31.
After reviewing these four cases, it is clear that RJFCO does not overstate the likelihood of profit or make claims that expected seasonal trends, compared to non-seasonal trends, will practically guarantee profits. The RJFCO commercial specifically focuses on El Niño, the effects of which one can hardly say were highly expected and predictable. RJFCO states that “[d]roughts, floods and other adverse conditions could dramatically alter the supply and demand dynamics of the corn market.” Not only did El Niño have an unanticipated effect on the corn market compared to other seasonal trends in other commodities markets, but this weather phenomenon also had no history that RJFCO APs could utilize to boast of previous profits. This is contrary to the bold statements made by the APs in Trinity, who bragged that they had consistently made money on the heating oil market, or the APs in In re JCC, Inc., who claimed that every fall heating oil goes up.
Nor does RJFCO’s promotional seminar focus on anticipated, historical seasonal trends. In fact, the seminar script focuses on unanticipated trends such as abnormal weather phenomena (such as Hurricane Andrew, a drought, and floods), political conditions (specifically August of 1990 and the impending Gulf War), and new technical, hypothetical models (in which “[t]ech-nical analysts use trading volume and price study along with charts or computer programs to identify and project trends- in the market”). Even when the script discusses the potential for profit in the heating oil market, RJFCO does not claim that the fluctuations in the demand for heating oil in the summer and winter will increase or decrease the price of an option or futures. Instead, the seminar focuses on unexpected events that may affect supply, such as storage facilities being depleted, pipelines being destroyed in Colombia and Northern Iran, and political events, such as the President of the United States dispatching the USS Nimitz to the Middle East.
The majority also contends that “the [sjeminar also impermissibly suggests that profits on options (the specific type of investment they were promoting) are proportionally related to the cash market.” However, stating that profits on options is proportionally related to the cash market is not necessarily fraud. In fact, it is only when the AP asserts a one-for-one or greater correlation between profits and movements in the cash price of the commodity that fraud exists. See CFTC v. Commonwealth Fin. Group, Inc., 874 F.Supp. 1345, 1352 (S.D.Fla.1994), rev’d in part and vacated in part, 79 F.3d 1159 (11th Cir.1996) (unpublished table decision). RJFCO.followed-the Chicago Board of Trade’s example. The Chicago Board of Trade’s options manual explains that “a one-cent change in the futures price would result in only a half-cent change in the option premium.” Therefore, when RJFCO explains in its script that by using an option, a twenty-two cent move in heating oil “could be 50-75% of the profit that the future would have earned,” RJFCO is *1340 assuming that a one-cent change in the futures price would result in only a half-cent change in the futures price. As the equation concludes, the script provides: “Now remember that profit is on a futures contract, and if you had a less aggressive option, because you want limited risk so you would receive 50% of that profit— 46200 divided by 2 equals $23,100.” RJFCO never asserts that profits on options directly move in relation to the cash market for the commodity.
II. RJFCO did not downplay or minimize the degree of risk involved in investing in commodity options.
Clayton Brokerage Co. of St. Louis v. CFTC, 794 F.2d 573, 580 (11th Cir.1986) (per curiam), tells us that “[t]he extent of disclosure necessary to provide full information about risk will vary depending on the facts and circumstances of trading as well as on the nature of the relationship between the broker and the customer.” This standard leaves a lot to be desired and provides courts with a significant amount of discretion as to what constitutes sufficient disclosure of risk. However, several cases, including Sidoti, In re JCC, Inc., and In re Staryk, provide us with some guidance as to how this standard is to be applied.
The majority extends the principles of law articulated in these cases into a set of facts where these principles should not apply. It reaches overly broad conclusions, such as “the Commercial overemphasizes profit potential and downplays risk of loss,” and “[the seminar] presents a distinctly unbalanced picture between the potential for profit and the potential for loss in options, inflating one while downplaying the other,” without grappling with the particular set of facts involved in the instant case. These conclusions are not supported by this record, nor is the legal standard underlying them supported by our precedent.
In Clayton Brokerage Co. of St. Louis, APs made affirmative misrepresentations as to risk; customers were told to “ignore the risk disclosure statement,” “that certain trading strategies can limit losses,” and “that the broker’s scheme can overcome inherent markets risks, or that certain commodities are less volatile.” Id. at 580-81.
In Sidot% the APs downplayed the degree of risk by telling customers that the risks of trading “commodity options were non-existent or minimal.” 178 F.3d at 1135-36.
In JCC, Inc., former APs testified that they were taught “to minimize risk, ... to characterize the $2500 management fee as insignificant compared to potential profits, and to use the Regulation 1.55 risk disclosure statement as a sales tool by explaining away various paragraphs of the document as inapplicable to the FLT program.” 63 F.3d at 1568. Customers were told that “they could lose no more than $500 in the sugar market,” “that foreign currencies were much safer than grain trading because of the guarantees of the movements in the currencies,” and that “we actually had very little risk at all.” In re JCC, Inc., [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 41,576.
In In re Staryk, although the AP would disclose risk, he would always downplay it by emphasizing the predictability of the price fluctuations in gasoline and heating oil. [1994-1996 Transfer Binder] Comm. Fut. L. Rep.(CCH) at 43,929. The administrative law judge determined that although the AP “remind[ed] customers that *1341 past performance may not guarantee success in the future, this generic warning of risk is almost always juxtaposed with information and statements which convey that this risk'is in fact small.” Id.
The disclosures of risk that were employed in Clayton Brokerage Co. of St. Louis, Sidoti, In re JCC, Inc., and In re Staryk are distinguishable from the risk disclosures provided by RJFCO in the instant case.[1] In its television commercial, RJFCO attempted to explain the risk to potential customers in four separate ways. The first, most obvious risk disclosure statement made by RJFCO was the statement found on the bottom one-fourth of the screen, which was kept on the screen for forty-five of the sixty seconds of the commercial’s running time. This statement, displayed in bold capital letters directly above RJFCO’s phone number, provided: “OPTIONS INVESTING INVOLVES A RISK OF LOSS. MINIMUM ACCOUNT $5,000.” Any viewer who jotted the phone number down would have seen the prominent risk disclosure statement displayed above the number.
The second disclosure statement flashed on the screen three seconds after the commercial began. It provided in bright yellow letters: “The preceding were hypothetical mathematical samples of leverage in the Commodity Options Market.” This disclosure clarifies, the point that RJFCO’s prediction was based upon a hypothetical that is not guaranteed to come true.
Third, and perhaps most important, the commercial is filled with conditional language^ — nothing is guaranteed. RJFCO is equivocal in its advertising — none of the language in the commercial suggests that El Niño mil definitely affect the corn market as predicted and that customers mil receive huge profit. Rather, the following conditional statements were made: “[El Niño’s] effect on world crops could mean huge profits in the grain markets.” “[Cjonditions may exist for profits as high as 200 to 300 percent.” “[Pf patterns continue, the effects could be devastating,” and “adverse conditions could dramatically alter the supply and" demand dynamics.”[2]
And finally, in the middle of the commercial, the announcer changes his tone (the voice drops) and we hear, “[ojption investing involves a high risk of loss and only risk capital should be used.” The concurring opinion suggests that this dis *1342 closure is inadequate to state the risk. How much more warning is required than a disclosure that the investment is a “high risk”? This flagrant risk disclosure statement, which is hardly brief within the format of the commercial, combined with the “RISK OF LOSS” statement conspicuously prominent on the screen throughout almost the entire commercial, the other statement explaining RJFCO’s mathematical formula, and the conditional language placed throughout the commercial, effectively and sufficiently discloses the magnitude of risk involved.
As for the promotional seminar, once again I find that there is an adequate amount of risk disclosure. One need only compare the seminar with the National Futures Association’s (NFA’s) manual[3] to see that RJFCO thoroughly disclosed risk according to the NFA’s suggestions.
For example, RJFCO’s promotional seminar provides: “In contrast to futures, options on futures allow investors and risk managers to define risk and limit it to the loss of a premium paid for the right to buy or sell a futures contract, while still providing the buyer with unlimited profit potential.” The NFA manual provides:
For the individual who has a price opinion (that a particular futures price will change by at least some given amount in a certain direction within a specific period of time), buying options offers the opportunity to realize substantial profits with a predefined and limited risk. The maximum an option buyer can lose— should events prove him wrong about the direction, extent or timing of the price change — is the premium paid for the option plus commissions and other transaction costs.[4]
The majority takes exception to the following assertions regarding unlimited profit potential and limited risk in options found in RJFCO’s seminar: “If you are highly aggressive and looking for unlimited profit potential as well as unlimited risk than [sic] it would be the futures. But most would like something less aggressive, something offering unlimited profit potential but limited risk-option trade.” The NFA manual confirms this for it provides: “[U]nlike an option which has limited risk, a futures position has potentially unlimited risk.”
Now, if the “limited risk with unlimited profit potential” had been “recited repeatedly as a sales inducement,” then these true statements could have become fraudulent in that the representation begins to “inflate the likelihood of profit while minimizing the risk of loss.” In re Staryk, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 45,809. That, however, is simply not the case here — the seminar does not overemphasize profit and downplay risk of loss. Rather, the introduction to the seminar provides, “These markets are risky — we want you to go away with ideas on how to limit your *1343 risk but still be positioned to take advantage of the volatility that not only make them exciting but potentially very profitable.” RJFCO actually mentions loss first, noting how options on futures contracts can limit this risk, and then mentions potential profit (not guaranteed or probable profit). Practically every affirmative representation on profit is counterbalanced with a risk warning. (“Past price action can provide you with clues to future action. The market is anticipatory, and you can see price movement first in the chart for the day.” The next paragraph then warns: “Chart signals, just like fundamental news can be misleading. You should have structure in you[r] approach to the markets.”)
Since I find no misleading or deceptive statements made by RJFCO in its commercial or seminar, there is no need to examine scienter and materiality. However, it bears mentioning that the majority found RJFCO to have “acted recklessly with regard to the statements aired on television.” The majority based this recklessness
on the fact that this Court and the CFTC have previously condemned attempts to attract customers by: (1) linking profit expectations on commodities options to known and expected weather events, seasonal trends, and historical highs; (2) suggesting that the commodities market can be correctly timed to generate large profits; and (3) substantially inflating option profit expectations while downplaying risk of loss.
I find no prior precedent supporting these contentions. At the most, these statements are oversimplifications of prior cases. Linking profit expectations on commodities options to known seasonal trends is only fraud if the AP “almost guarantees profits,” as in Sidoti, or “distorts the likelihood of profit,” as in In re JCC, Inc. Suggesting that the commodities market can be correctly timed to generate profits is not necessarily fraud when, as stated in In re Staryk, “[i]t is only when unexpected events occur, including higher or lower than expected demand for gasoline, that an option may become profitable.” [1994— 1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 43,931. And the majority’s buzz phrase, “substantially inflating option profit expectations while downplaying risk of loss,” is much too vague and abstract a standard to be of any use to commodities brokerage firms who wish to advertise their services in the future.
The difficulty with the current standard for commodity options fraud is that Rule 33.10 is too vague. According to the majority opinion, in order to establish a fraud claim in an enforcement action under the CEA, the CFTC must prove: “(1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality.”[5] Therefore, much of the case law from this standard has been both arbitrary and conflicting. Additional guidelines must be introduced to further clarify the elements of fraud under Rule 33.10.
Courts have had the most difficulty in determining what constitutes a material misrepresentation or a material omission. According to the majority opinion, “whether a misrepresentation has been made depends on the ‘overall message’ and the ‘common understanding of the information *1344 conveyed.’” As for materiality, a statement is considered material if “there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision.” Saxe v. E.F. Hutton & Co., 789 F.2d 105, 111 (2d Cir.1986). Unfortunately, Rule 33.10 and case law do not provide adequate guidance to either the CFTC or commodity futures brokerage firms.
While every claim of commodities fraud must be reviewed on a case-by-case basis under the existing standard, a more specific interpretation of the elements under Rule 33.10 would create a standard whereby “material misrepresentations or material omissions” would be more readily discernible.
What constitutes a “material misrepresentation”?
(1)The most obvious material misrepresentations are outright falsehoods told by brokerage firm APs and sales staff to prospective or current customers. Examples of blatant material misrepresentations include promising to open a trading account and not doing so, reporting erroneous account balances, or making unlawful trades in a customer’s account without his or her authorization. See CFTC v. Muller, 570 F.2d 1296, 1300-01 (5th Cir.1978) (finding evidence sufficient to support an injunction because AP lied concerning opening of bank account and supplied fictitious options trade statements). A material misrepresentation also occurs if an AP lies about the amount of profits earned, or losses accrued, in a customer’s trading account. See CFTC v. Rosenberg, 85 F.Supp.2d 424, 447 (D.N.J.2000) (finding fraud because the AP reported trading profits when no profits had been earned and failed to report losses on trades he was not authorized to make).
(2) A material misrepresentation that is not patently obvious, but just as damaging, exists when a brokerage firm deliberately overstates profit potential and conceals the possibility of loss. Any prediction or recommendation must have a reasonable basis in fact and should be explicitly labeled just that — a prediction and not a guarantee. A statement regarding potential profits that could be earned should not be considered a material misrepresentation or misleading statement if it is possible that these projected earnings could realistically occur.
For example, RJFCO informed customers of the potential for profits up to 300% if the El Niño atmospheric disturbances occurred as projected. If this profit potential was attainable, and RJFCO compiled significant research which suggested climactic conditions created by the El Niño phenomenon could create drought and thereby increase the price of grain due to its scarcity, then RJFCO’s marketing strategy did not represent a material misrepresentation.
Existing case law reflects situations, unlike RJFCO, where other firms made unwarranted profit predictions which were considered to be inherently fraudulent due to an absence of technical research or proof to back up these claims. See CFTC v. J.S. Love & Assocs. Options, Ltd,., 422 F.Supp. 652, 660 (S.D.N.Y.1976); In re British Am. Commodity Options Corp., Nos. 76-15 and 77-3 (C.F.T.C. Dec. 2, 1977), noted in [1977-1980 Transfer Binder] Comm. Fut. L. Rep. ¶ 20,526 (C.F.T.C. Dec. 2, 1977), avail, on Westlaw FSEC-Admin. DATABASE, 1977 WL 13558, at *11-12.
(3) Also, any claim about a brokerage firm’s past trading record or an AP’s puffing of past successes should be based upon actual trades executed in the market place *1345 and should fairly represent results achieved for those periods. CFTC Interpretative Letter No. 77-16 [1977-1980 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,498, 22,065 (Oct. 18, 1977); see Clayton Brokerage Co. of St. Louis, 794 F.2d at 575 (finding fraud when AP boasted of his successes and none of his failures); Commonwealth Fin. Group, Inc., 874 F.Supp. at 1358 (where salespeople misrepresented the past success of themselves and their firm by telling prospective customers that current clients have “recently doubled their money” and that the firm “has the best track record in the industry and has made millions of dollars in profits for their customers with little risk”).
What constitutes a “material omission”? Omissions of material fact are rarely transparent and perhaps more subject to questionable interpretation than even material misrepresentations.
For example, a brokerage firm must disclose to potential and current customers the amount of risk inherent in commodity futures and options trading. However, an undefined, grey area exists between no disclosure and full disclosure. If there is no mention of risk on the part of the brokerage firm, then a material misrepresentation exists — options trading is a risky business, and customers need to be told about the possibility of losing their entire investment. The mandatory risk disclosure statement required by the CFTC puts the customer on notice of the risks of trading; however, in some instances this disclosure statement is contradicted by oral representations made by APs who tell customers to disregard this statement. See Clayton Brokerage Co. of St. Louis, 794 F.2d at 580; In re JCC, Inc., 63 F.3d at 1568 (where the risk disclosure statement was explained away as “inapplicable”); but see Puckett v. Rufenacht, Bromagen & Hertz, Inc., 903 F.2d 1014, 1019 (5th Cir.1990) (finding that the written risk disclosure statement was sufficient enough to inform the Pucketts of the risks involved because Dr. Puckett, an educated and successful businessman who had traded securities for more than thirty years, was capable of understanding the risk disclosure statement, and admitted that he affirmatively sought risk in order to make profits).
Therefore, in order to avoid any misunderstanding or charges of misrepresentation, it would be preferable for brokerage firms to err on the side of caution and provide both written and oral disclosure statements to potential investors. If not, these firms may leave themselves open to charges that they fraudulently omitted material statements regarding risk of loss. See CFTC v. Crown Colony Commodity Options, Ltd., 434 F.Supp. 911, 916 (S.D.N.Y.1977) (holding that the commodity options sales presentations at issue were fraudulent because they “conveyed the distinct impression that extraordinary short-term profits were all but certain to be realized by investors” and because the mechanics of commodity options trading were misrepresented).
These guidelines are merely suggestions, on my part, on how to both interpret the existing standard and provide the commodities industry with additional safeguards to ensure the legality of their sales presentations, promotional seminars, and conduct while maintaining their customers’ trading accounts.
III. RJFCO had no affirmative duty to disclose its trading record.
The majority implies in its opinion that RJFCO had a duty to disclose its previous *1346 track record to prospective customers. However, the majority fails to point to any prior authority that suggest that there is a specific affirmative duty on the part of a commodities brokerage firm to disclose its prior track record. The cases in the majority opinion suggest that a duty to disclose arises only if the firm’s statements would be misleading or deceptive if it did not disclose its track record. Ziemba v. Cascade Int’l, Inc., 256 F.3d 1194, 1206 (11th Cir.2001) (We recognize a duty to disclose when “a defendant’s failure to speak would render the defendant’s own prior speech misleading or deceptive”); Rudolph v. Arthur Andersen & Co., 800 F.2d 1040, 1043 (11th Cir.1986) (“[A] defendant’s omission to state a material fact is proscribed only when the defendant has a duty to disclose”) (emphasis added). Simply put, there is no mandatory duty to disclose.
The majority argues that a reasonable investor would “surely” want to know how many RJFCO investors had lost money, and, therefore, it was RJFCO’s duty to tell them. If it is the case that investors “surely” wanted to know this information before they invested, then why didn’t they ask? This is not a case where the APs misrepresented the firm’s track record or lied about successes in the past. See Modlin v. Cane, [1999-2000 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 28,059 at 49,549-50 (CFTC Mar. 15, 2000) (The AP told customers “his method of trading was successful” and was “the key to making money,” and “that he would jump into the East River if he was unable to generate a profit.”). RJFCO never made any bold misrepresentations regarding its prior track record and, therefore, was under no duty to disclose its record.
CONCLUSION
Commodities brokerage firms need to disclose both the profit potential and risks involved in options trading. RJFCO does just that — disclosing the appropriate amount of profit potential as well as the adequate amount of risk.
Trading options on futures contracts is inherently risky. The fact of the matter is, in options, you are either going to lose big or win big — that is why brokerage firms like RJFCO can advertise potential profits of up to 200 to 300% and must also warn that this type of investment involves a high risk of loss (only risk capital should be used).
Admittedly, under Sidoti, In re JCC, Inc., Bishop, and In re Staryk, the standard for fraud is vague. However, these cases at least provide a sensible set of guidelines for brokerage firms to follow in designing their solicitations and advertising programs. Essentially, these cases suggest that brokerage firms must not misrepresent or guarantee profits, nor minimize the degree of loss. However, in this case, the majority has extended the standard to apply to a situation where a firm did not misrepresent or guarantee profits and in fact disclosed the amount of risk involved.[6] And the majority opinion simply fails to offer any useful guidance to actors in this area of the law.
Commodities brokerage firms should be on the alert — this decision may make it difficult to advertise and solicit business in the future. It is uncertain what subsequent advertising language may “overemphasize profit and downplay risk of loss.” I dissent.

. It is worth noting that the seven customers who testified against RJFCO acknowledged that they understood the level of risk involved in trading commodities. Several of these customers either maintained/traded stock and mutual fund investments or studied commodity futures. Most of RJFCO's customer base consisted of people who had themselves first inquired into commodity trading: they were not sought out.
It was also determined at trial that all seven of these customers received and had an opportunity to review the risk disclosure booklet before opening an account. The risk disclosure booklet explained the amount of risk involved in options trading. The customers were also advised that only risk capital should be invested in this kind of market. And each customer approved every trade before any trade was placed by an RJFCO AP.

. RJFCO's chief market analyst studied the various commodities markets and developed a reasoned trading strategy. RJFCO’s trading strategy was based on, as the district court found, “deliberate research and logical assumptions and the strategy was developed primarily to yield profit for RJFCO clients, not simply to generate commissions.” CFTC v. R.J. Fitzgerald. & Co., 173 F.Supp.2d 1295, 1307 (M.D.Fla.2001). Numerous reports from a variety of prominent and respected financial and meteorological sources were examined to develop the strategy predictions.

. The NFA's manual, which was admitted into evidence at trial and is part of the record on appeal, provides an introduction to options on futures contracts, how they work, and the opportunities and risks associated with their purchase. The NFA is a self-regulatory organization in the futures industry.

. This explains that RJFCO’s calculations in its profit illustration that the majority claims are false — "Now remember that profit is on a futures contract, and if you had a less aggressive option, because you want limited risk so you would receive approximately 50% of that profit — 46200 divided by 2 equals $23,100”— are actually possible according the NFA's manual. A less aggressive option on a futures contract does create limited risk.

. While customer reliance on the misrepresentation need not be proven in a CFTC enforcement action alleging fraud, it is essential to restitution relief sought to compensate the injured party. CFTC v. Rosenberg, 85 F.Supp.2d 424, 447 (D.N.J.2000).

. No customer suffered a loss beyond his or her initial investment.