COMMODITY FUTURES TRADING COMMISSION, Plaintiff,

v.

CROWN COLONY COMMODITY OPTIONS, LTD., a New York Corporation, Allen M. Goldschmidt, Arnold Tenney, Joseph Alter, Joel Steiner, Samuel Pattera, Martin Davidson, Ronald Yales, Defendants.

No. 77 Civil 2678.

United States District Court, S. D. New York.

June 15, 1977.

---

William R. Schief, Director, Division of Enforcement, Michael J. Stewart, Deputy Director, Robert A. W. Boraks, Sp. Trial Counsel, Stephen C. Leckar, Atty., Commodity Futures Trading Commission, Washington, D. C., for plaintiff; Leslie A. Blau, New York City, of counsel.

Levine, Reckson & Reed, Miami, Fla., for defendants Steiner and Alter; Allen Reed, Miami, Fla., of counsel.

Gusrae, Greene & Kaplan, New York City, for defendants Crown Colony Commodities Option Corp., Goldschmidt and Tenney; Martin H. Kaplan, David Greene, New York City, of counsel.

Mark Gasarch, New York City, for defendant Pattera.

Joseph Callahan, New York City, for defendant Davidson.

EDWARD WEINFELD, District Judge.

Plaintiff, the Commodity Futures Trading Commission (the "Commission"), a regulatory agency established under the 1974 amendments to the Commodity Exchange Act[1] (the "Act" or "Commodity Act") and charged with the enforcement and administration of various provisions of the Act,[2] brings this action for preliminary and permanent injunctive relief restraining the defendants from engaging in alleged practices in violation of the Act and regulations promulgated thereunder.[3]

The corporate defendant is Crown Colony Commodity Options, Ltd. ("Crown Colony"), a New York corporation that maintains an office in this district and formerly conducted operations in Miami, Florida, and Chicago, Illinois. The individual defendants include Allen M. Goldschmidt, chief executive officer of Crown Colony, who directed its operations and affairs in New York City; Joseph Alter, an officer, and Joel Steiner, a management employee, both of whom directed the affairs and policies of Crown Colony's Miami office; Arnold Tenney, a director and fifty percent shareholder of Crown Colony and a resident of Canada, who, together with Goldschmidt, participated in the overall control and operation of Crown Colony; and Martin Davidson, a supervisor-manager employed at the Miami office.[4]

Since February 1976, Crown Colony has been engaged primarily in the business of offering and selling London commodity options to investors throughout the United States. The gravamen of the Commission's complaint is that the defendants engaged in pervasive, continuing fraudulent conduct calculated to cheat and deceive customers in connection with their purchases of commodity options. The Commission initially applied for a temporary restraining order upon notice to the defendants, as required by the Commodity Act.[5] Upon representations by the defendants' attorneys that neither Crown Colony nor any individual defendant was any longer active in offering or selling commodity options, the Court refrained from issuing a temporary restraining order and set a date for a hearing on the Commission's motion for a preliminary injunction. During the hearing, which extended over a three-day period, the Commission supplemented its affidavits and exhibits with the testimony of witnesses, including several customers of Crown Colony and a former supervisory salesman in the Miami office. The witnesses included, unfortunately for the defendants, a securities commissioner of Texas, who, after hearing the initial sales pitch made to him over the telephone, tape recorded subsequent conversations with Crown Colony salesmen. The defendants neither testified themselves nor offered affidavits to negate the charges made by plaintiffs.

After a careful review of all relevant and material evidence and an evaluation of the demeanor of the witnesses, the Court is persuaded that the plaintiff has abundantly established its charges that the defendants, singly and in concert with one another, engaged over an extended period in acts and practices proscribed by the Commodity Act and the rules adopted by the Commission thereunder.

As noted, the defendants were in the business of offering and selling London commodity options to investors. A commodity option must be differentiated from a commodity futures contract. The latter is a contractual undertaking, which can be

---

1. Commodity Futures Trading Commission Act of 1974, Pub.L. No. 93–463, 88 Stat. 1389, *amending* Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*

2. *See id.*

3. *See id.* § 13a–1.

4. Samuel Pattera, also named as a defendant, consented to a preliminary injunction without admitting the allegations of the complaint. At the commencement of the hearing on the motion for preliminary injunctive relief, the Commission consented to a dismissal of the complaint against another defendant Ronald Yales.

5. 7 U.S.C. § 13a–1.

transferred to third parties, to buy or sell a fixed amount and grade of a certain commodity on some specified date. A commodity option, on the other hand, confers upon the holder the right to buy ("call option") or to sell ("put option") either a specified amount of a commodity or a futures contract for that amount of a commodity within a certain period of time at a given price (the "strike price").[6]

In passing the 1974 amendments to the Commodity Act, Congress delegated nearly unfettered authority to the Commission to regulate, or indeed ban, trading of commodity options in the United States.[7] Pursuant to this grant of authority, the Commission adopted Rule 32.9, which reads as follows:

> It shall be unlawful for any person directly or indirectly—
>
> (a) To cheat or defraud or attempt to cheat or defraud any other person;
>
> (b) To make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof;

(c) To deceive or attempt to deceive any other person by any means whatsoever; in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction.[8]

As adopted, Rule 32.9 is as broad as, if not broader than, Rule 10b-5 adopted by the Securities and Exchange Commission under the Securities Exchange Act of 1934.[9] The legislative history of the Commodity Act and the Commission's express intent in adopting Rule 32.9 indicate that the Rule, like Rule 10b-5, should be read so as to effect the purposes of the Act and the policies of the Commission in regulating commodity options.[10] In this regard, cases decided under the antifraud provisions of the securities acts are instructive in interpreting Rule 32.9.[11] It should be noted, however, that the activities of the defendants in the present case do not pose difficult questions of statutory interpretation. As will be seen, the defendants purposefully engaged in the sort of continuous, concerted fraudulent practices that lie at the core of

---

**6.** The purchaser of a commodity option pays a "premium" to acquire the option; the amount of this charge will vary depending on the duration of the option, market conditions at the time of the purchase and mark-ups in price by intermediary dealers. Brokers or dealers commissions and fees are also paid on both the purchase and exercise of the option. A call option can yield a profit to the investor if the underlying commodity's price rises sufficiently to offset the investor's expenditures on the premium and commissions. When such a point is reached, the investor can exercise the option at the strike price and simultaneously sell at the higher market price the commodity or futures contract that has been acquired. Any proceeds realized beyond the amount of the premium and commissions are the investor's profits. Similarly, a put option can be exercised profitably if the price of the underlying commodity has declined enough to offset expenditures when the commodity or a futures contract covering it is purchased at the market price and simultaneously sold at the higher strike price. If price fluctuations in the underlying commodity are only partially sufficient to offset an investor's expenditures, he may nevertheless recoup a portion of his expenses by exercising his option before the expiration date. Of course, if the option is not exercised

before it expires, the investor sacrifices his premium and cannot recoup commissions.

**7.** *See* 7 U.S.C. § 6c(b). That provision reads in relevant part:

> [No person shall enter into a commodity options transaction technically permissible under the Act] contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe  .   .   ..

**8.** 41 Fed.Reg. 51808, 51817 (Nov. 24, 1976). An antifraud provision substantially identical to Rule 32.9 was adopted by the Commission on an interim basis on June 24, 1975, *see* 40 Fed. Reg. 26505–06, and was codified as 17 C.F.R. § 30.01. The present rule reflects a section number redesignation and contains some minor language modifications, but was not intended by the Commission to work substantive changes. *See* 41 Fed.Reg. 51813 (Nov. 24, 1976).

**9.** 17 C.F.R. § 240.10b-5.

**10.** *See Commodity Futures Trading Comm'n v. J. S. Love & Assocs. Options, Ltd.*, 422 F.Supp. 652, 658–59 (S.D.N.Y.1976) and sources cited therein.

**11.** *Id.* at 660.

the prohibitions contained in Rule 32.9.[12] The essence of the Commission's charges is that the defendants actively operated a high-powered "boiler room,"[13] principally from the Miami office, in attempting to sell, and selling, London commodity future options to persons throughout the United States, and in so doing engaged in various acts and conduct aimed to cheat, to defraud, or to deceive their customers.

The origin of the Miami branch office of Crown Colony suggests the nature of its operations. Defendants Tenney and Goldschmidt, the founders of Crown Colony, organized the Miami branch as a base for conducting nationwide, "cold-canvass"[14] telephone solicitations of potential purchasers of commodity options. In setting up the Miami operation, Tenney and Goldschmidt enlisted the aid of defendant Alter, who had experience in running telephone solicitation operations. Alter assisted Tenney and Goldschmidt in locating the Miami offices in a building owned by Alter's father-in-law, out of which wigs and chemicals were sold over the telephone during the day. The building housed numerous telephones tied into a long distance WATS facility and a central monitoring system that allowed salesmen's supervisors to listen in on conversations or to broadcast such conversations to other salesmen over a speaker system. Crown Colony established its offices in a section of the building not being used by the wig and chemical operations, and it made use of the WATS facilities during the evening hours when wigs and chemicals were not being sold.[15]

The Miami sales room, out of which Crown Colony's telephone operators made their calls, was divided into two work areas, each of which contained approximately twenty-five telephone cubicles with directional microphones that allowed supervisors to address the salesmen without being overheard by customers on the line. Crown Colony made no attempt to hire salesmen with any knowledge of the commodity markets and only instructed salesmen in the rudimentary terms applicable to options trading. The training given salesmen was geared to produce sales and overcome customer resistance, and salesmen were told that the less they knew about commodities the better salesmen they would be. The salesmen worked in two three-hour evening shifts of approximately fifty persons each; each supervisor was responsible for the ac-

12. For this reason, and because Rule 32.9 is reasonably clear on its face, the Court denies the defendants' motion, made at the outset of the hearing on the preliminary injunction, to hold the Rule unconstitutionally vague and dismiss the plaintiff's complaint. *See Parker v. Levy,* 417 U.S. 733, 755–57, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *Broadrick v. Oklahoma,* 413 U.S. 601, 608, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *United States v. National Dairy Prods. Corp.,* 372 U.S. 29, 32–33, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963); *United States v. Chestnut,* 394 F.Supp. 581, 588 (S.D.N.Y.1975); *United States v. Pope,* 189 F.Supp. 12, 20–21 (S.D.N.Y. 1960).

13. A description of a "boiler room" operation was given by the District Court for the Southern District of Florida in *SEC v. R. J. Allen & Assocs., Inc.,* 386 F.Supp. 866, 874 (S.D.Fla. 1974):

"Boiler room" activity consists essentially of offering to customers securities of certain issuers in large volume by means of an intensive selling campaign through numerous salesmen by telephone or direct mail, without regard to the suitability to the needs of the customer, in such a manner as to induce a hasty decision to buy the security being of-

fered without disclosure of the material facts about the [security].

14. In a "cold canvass" campaign, the salesman solicits potential investors to whom he has not been recommended and with whom he has had no previous contacts. In essence, Crown Colony's business consisted of attempting to sell options to complete strangers who, prior to being contacted, had expressed no interest in purchasing such options. So pervasive and random was this campaign that, in addition to soliciting a state securities commissioner, the defendants contacted a district attorney for Napa County, California, and a deputy district attorney for Los Angeles County, California. The former, alerted to the nature of the sales pitch, also made a tape recording of a subsequent conversation.

15. Most of the telephone solicitations made from the Miami office were directed to persons residing within the western time zones. Some time after the Miami operation was set up, Crown Colony established a small day shift during which salesmen would solicit customers located on the East Coast.

tivities of approximately twelve salesmen. The salesmen received a commission of ten per cent of the purchase price paid by a customer for an option, and supervisors received a commission of ten per cent on their own sales and of one-half per cent on the sales of their salesmen. The evidence establishes that intense pressure was brought to bear on salesmen to produce sales; those who could not generate approximately $500 in commissions each week were often dismissed from their jobs.[16]

Crown Colony employed a highly standardized system for contacting customers in the effort to persuade them to invest in commodity options. The names and telephone numbers of potential investors were apparently purchased in bulk from third parties specializing in the generation and distribution of "mailing lists." The initial contact with a customer consisted of the presentation of a script or canned sales pitch called a "front." These fronts, irrespective of the commodity options to which they related, were calculated to do two things only: first, "to stimulate the greed"[17] of potential customers by emphasizing the opportunity for unlimited profits in commodity options, and second, to screen out those who simply did not have funds available or obtainable to invest in options. Although the defendants argue that the fronts did not go so far as to guarantee profits, it is clear beyond doubt that—at a minimum—they conveyed the distinct impression that extraordinary short-term profits were all but certain to be realized by investors. The fronts were thus misleading and inaccurate, and the predictions contained therein were made without a reasonable belief of their accuracy.[18] Moreover, Crown Colony frequently informed inves-

tors that a commodity was trading at less than its actual market price in order to be able to report a sharp price "rise" at a later date and thus pressure customers to "get in while the getting was good."

After being qualified during the front, an investor was ordinarily "papered," or sent various brochures purporting to describe the mechanics of option trading, the nature of Crown Colony's business and the advantages of investing in whatever option was being promoted at the time. This literature abounds in misleading, incomplete and deceptive statements. For example, it misrepresents that investors in London options "receive protection from contracts written through and backed by the International Commodity Clearing House [ICCH] . . which has capital and reserves in excess of $50 million [and] guarantees due fulfillment of each contract registered under its regulations." Contrary to the impression conveyed, the guarantees of the ICCH extend only to members of that organization and not to United States investors or to Crown Colony. Among other matters, the literature also misrepresents: (1) that the premium paid by the customer for an option was a "one-time flat fee" constituting the "entire financial exposure to the investor" (when in fact the investor was required to pay a commission on the exercise of the option, even if that exercise merely salvaged a portion of his equity); (2) that an investor in a call option would realize a profit if prices rose, and an investor in a put option would do so if prices fell (when in fact profits would accrue only if the price fluctuation was sufficient to offset the premium paid by the investor for the option); and (3) that Crown Colony was a member of the New York Mercantile Exchange

---

**16.** Crown Colony placed newspaper ads for salesmen that "guaranteed" $500 per week in commissions; in fact, salesmen were guaranteed to be dismissed if they did not earn commissions in this range.

**17.** The former Crown Colony supervisory salesman who testified at the hearing stated that this term was used regularly by employees and supervisors at the Miami office. According to his testimony, potential investors were referred

to as "mooches," and salesmen were told that "the mooch has your money in his pocket."

**18.** *See Franklin Savings Bank v. Levy*, 551 F.2d 521, 527 (2d Cir. 1977); *Hanly v. SEC*, 415 F.2d 589, 596–97 (2d Cir. 1969); *cf. United States v. Wolfson*, 405 F.2d 779, 785 (2d Cir.), *cert. denied*, 394 U.S. 946, 89 S.Ct. 1275, 22 L.Ed.2d 479 (1968); *United States v. Herr*, 338 F.2d 607, 610 (7th Cir. 1964), *cert. denied*, 382 U.S. 999, 86 S.Ct. 563, 15 L.Ed.2d 487 (1966).

(which it was not; only Goldschmidt was a member).

After being papered an investor was again telephoned by a Crown Colony salesman, who presented a second canned sales pitch called a "drive." Like the fronts used by Crown Colony, the drives contained many misleading and deceptive statements intended to pressure customers into investing in options. For example, they reiterated that the customer's investment was guaranteed by the ICCH; they stated that each time a commodity's price increased it was money "in the customer's pocket"; they misrepresented that Crown Colony's customers invested in copper options at $2,200 and were sold out six weeks later at $7,600; they stated that Crown Colony had "a man on the floor in London" standing by to purchase an option for the customer at the best strike price available, when, in fact, Crown Colony had no man "on the floor in London" but purchased its customers' options in bulk through an American brokerage house; and they emphasized that the Crown Colony salesman would remain in "constant touch" with his customer, when, in fact, customers were regularly neglected, and even denied access to salesmen, once they had invested.[19]

When Crown Colony salesmen encountered resistance on the part of customers, they often departed from the prepared scripts and made misrepresentations even more egregious than those contained in the canned pitches. The tape recording made by the Texas securities commissioner, for example, contained statements by a salesman in the New York office that both assured profits and represented that no Crown Colony customer ever lost money on his investment. The supervisors and management of the Miami office were aware that such misrepresentations were regularly made, but took no steps to correct them or to discipline salesmen responsible for them.[20]

In addition to making or encouraging the making of myriad misrepresentations to customers, the defendants engaged in, promoted and supervised certain policies and practices that also were violative of Rule 32.9. The substantial markups and commissions charged to customers upon their purchase of options were, as a regular practice, actively concealed from customers, and, on occasion, actually misrepresented to be much lower than they actually were.[21] Similarly, investors were never informed of the deleterious effects that foreign currency fluctuations could have on their investments in London options, which had to be purchased in pounds rather than in dollars and which contained strike prices payable in pounds.[22] When investors inquired concerning the effects of currency fluctuations, they were told that such fluctuations could

---

**19.** False or misleading statements contained in various Crown Colony scripts include the following:

> I'm particularly bullish on natural rubber and I know it's a very underpriced situation and I think it's an opportunity to take $4,400 [and] turn it into $16,000 by the end of fall.
> What we're talking about is a 33,000 lb. contract therefore each time rubber moves one penny that's equal to $330.
> Mr. ——, your option runs 'till March 77 . . . but more important, we'll be out by the end of summer, beginning of fall at the latest—we're talking about a five figure return on a $4,400 investment. I'm talking about $16–17,000 or quadrupling your investment. Is that fair enough????
> As we get notification of receipt of your funds, we will telex our man on the floor in London to get your strike price. You will receive your contract which will have your I.C.C.H. registration number protecting your

investment. That number means that your option contract is backed with a cash reserve in excess of $50 Million!!! Guaranteeing your investment. — Is that clear???
> I'll be in constant touch with you and I want you to feel free to call me person to person collect anytime you desire no matter how trivial your questions may be.

**20.** The former Crown Colony supervisory salesman testified at the hearing that he brought to Steiner's attention that investors were regularly being misled with respect to profits, premiums and their equity positions and was told by Steiner to "ignore it" and "mind his own business."

**21.** *See Commodity Futures Trading Comm'n v. J. S. Love & Assocs. Options, Ltd.,* 422 F.Supp. 652, 655 (S.D.N.Y.1976).

**22.** *See id.*

only work to the investors' advantage—an outright falsehood.

It was also the regular practice of Crown Colony to "load" and "roll" customers who made an initial option purchase. "Loading" refers to the policy of attempting to sell additional options to a customer who has once purchased, without respect to the investor's realistic ability to afford further investment and without regard to the soundness of the investments themselves at the time of the loading. "Rolling" consists of exercising a customer's option that has turned out to be profitable and reinvesting all or a portion of the proceeds in another option on a different commodity for the purpose of generating extra commissions. Crown Colony regularly appropriated large portions of investors' profits by rolling them without regard to whether the new investment was more advantageous than the old, if advantageous at all. Indeed, old customers were at times urged to sell coffee and buy sugar options with the proceeds while Crown Colony was extolling the virtues of coffee options to new customers. Both "loading" and "rolling" of customers was actively encouraged by those at Crown Colony in supervisory or managerial positions.

Finally, Crown Colony effected purchases and sales of options that were unauthorized by customers and refused to comply with direct customer orders to exercise options. These practices were abundantly established at the hearing on the preliminary injunction. One customer of Crown Colony testified that his salesman liquidated his coffee options and reinvested a substantial portion of the proceeds in sugar options without his consent. Another witness stated that in a conversation with defendant Davidson, he had consented to purchase a rubber option only if Davidson could obtain a strike price equivalent to 36 or 37 cents per pound, but that Davidson purchased an option with a strike price of 47 cents per pound and refused to take steps to rectify his action when requested to do so. A former IBM executive testified that, after having repeatedly called Miami in unsuccessful attempts to speak with his salesman about exercising his option, he went directly to Crown Colony's New York office and, after a two hour wait, directed Goldschmidt to liquidate his position and thus recoup some of his investment. Goldschmidt did not do so. Another witness at the hearing related a similar failure by Goldschmidt to exercise an option when ordered to do so. These refusals to execute customers' orders clearly violated the rules promulgated by the Commission.[23]

In sum, the evidence tendered to the Court—the substance of which has not been controverted by affidavits or testimony of the defendants—fully establishes that the defendants knowingly and purposefully conducted a "boiler room" operation calculated to sell as large a volume of options as possible to customers throughout the United States without regard to the suitability of the investment for customers, the soundness of the investments themselves, or the accuracy and completeness of representations made to induce purchases. Each of the defendants promoted, aided, abetted or participated in the operation of the "boiler room." There can be no doubt at this juncture that the Commission has shown a plethora of grave, willful violations of the Commodity Act and of the rules adopted under it.

The issue remains whether to grant the preliminary relief sought by the Commission. This action was brought pursuant to section 13a–1 of the Commodity Act, which authorizes the Commission to bring an action for injunctive relief "[w]henever it shall appear . . . that any . . . person has engaged, is engaging or is about to engage in any act or practice constituting a violation of any provision of [the] Act

---

**23.** *See Haltmier v. Commodity Futures Trading Comm'n*, 554 F.2d 556, 559–560 (2d Cir. 1977), (applying 7 C.F.R. § 6(b)). In November 1976, the Commission adopted Rule 32.8(c), which renders it unlawful for "[a]ny person, upon receipt of an order for a commodity option transaction, unreasonably to fail to secure prompt execution of such order." 41 Fed.Reg. 51817 (Nov. 24, 1976).

or any rule, regulation or order thereunder . . . ." [24] The language of this provision is nearly identical to that of section 20(b) of the Securities Act of 1933 [25] and to that of section 21(e) of the Exchange Act of 1934,[26] which authorize the Securities and Exchange Commission to seek injunctive relief against securities law violators. Given this, it would appear that the conditions under which injunctive relief can be obtained by the Commission are the same as those outlined in cases arising under the securities acts.[27]

Thus, the standard governing the issuance of an injunction is whether "there is a reasonable likelihood that the wrong will be repeated." [28] It should be noted that because the Commission's power to seek such relief is created and governed by statute, no showing of irreparable harm in the absence of relief need be made.[29]

The defendants, apparently recognizing the overwhelming proof of violations, nevertheless assert that they should not be preliminarily enjoined from further violating the Commodity Act because each of them has ceased all activity with respect to commodity options,[30] and there is thus no likelihood of future violations. However, as the Court of Appeals for this circuit has recently noted, "the commission of past illegal conduct is highly suggestive of the likelihood of future violations." [31] The fact that the defendants for the moment may have ceased their activities is but one factor to be considered in determining whether an injunction should issue, and it by no means compels denial of preliminary relief.[32] The defendants in this proceeding have engaged in myriad, recurrent violations of the Commodity Act and rules established thereunder. These violations were of the most serious nature, yet the defendants, fully aware of what they were doing, pursued a crass and callous policy of indifference to the law, to the needs and circumstances of their customers and to the public interest in the area of commodity option trading. Not a single defendant has come forward with

---

**24.** 7 U.S.C. § 13a–1.

**25.** 15 U.S.C. § 77t(b).

**26.** 15 U.S.C. § 78u(e).

**27.** *See Commodity Futures Trading Comm'n v. J. S. Love & Assocs. Options, Ltd.,* 422 F.Supp. 652, 661 (S.D.N.Y.1976); *Commodity Futures Trading Comm'n v. British American Commodity Options Corp.,* 422 F.Supp. 662, 664 (S.D.N.Y.1976).

**28.** *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1100 (2d Cir. 1972); *see SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 807 (2d Cir. 1975); *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 394, 405–06 (2d Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973).

**29.** *SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 808 (2d Cir. 1975); *Commodity Futures Trading Comm'n v. J. S. Love & Assocs. Options, Ltd.,* 422 F.Supp. 652, 661 (S.D.N.Y. 1976); *Commodity Futures Trading Comm'n v. British American Commodity Options Corp.,* 422 F.Supp. 662, 664 (S.D.N.Y.1976).

**30.** Crown Colony asserts that it has shut down its branch offices and maintains its New York City office for the sole purpose of answering existing customers' inquiries about their accounts. Crown Colony claims that its cessa-

tion of trading activity was not prompted by the present litigation, but was necessitated by its inability to comply with the Commission's newly promulgated regulations dealing with segregation of customers' funds, *see* Rule 32.6, 41 Fed.Reg. 51815–16 (Nov. 24, 1976), which were recently upheld by the Court of Appeals for this circuit in *British American Commodity Options Corp. v. Bagley,* 552 F.2d 482, (2d Cir. Apr. 4, 1977).

**31.** *SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 807 (2d Cir. 1975); *see SEC v. Universal Major Indus. Corp.,* 546 F.2d 1044, 1048 (2d Cir. 1976); *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1100 (2d Cir. 1972); *SEC v. Culpepper,* 270 F.2d 241, 251 (2d Cir. 1959); *SEC v. Cooper,* 402 F.Supp. 516, 525 (S.D.N.Y. 1975).

**32.** *See SEC v. Universal Major Indus. Corp.,* 546 F.2d 1044, 1048 (2d Cir. 1976); *SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 807 (2d Cir. 1975); *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1101 (2d Cir. 1972); *SEC v. Boren,* 283 F.2d 312, 313–14 (2d Cir. 1960); *SEC v. Culpepper,* 270 F.2d 241, 250–51 (2d Cir. 1959); *SEC v. Torr,* 87 F.2d 446, 449 (2d Cir. 1937); *SEC v. Cooper,* 402 F.Supp. 516, 525 (S.D.N.Y.1975); *see also United States v. Parke, Davis & Co.,* 362 U.S. 29, 47–48, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960) (vertical price-fixing).

testimony to challenge the substantive charges brought against him; nor has any defendant expressed regret for his past conduct or indicated a recognition of its gravity. The present plea of lack of purpose to commit future violations must yield to the fact of pervasive wrongdoing over an extended period. Their past actions speak louder than their present words. Under these circumstances, the Court is fully persuaded that a preliminary injunction against further violations should issue forthwith.

Submit order in accordance with the foregoing.