**AMERICAN STOCK EXCHANGE, INC. and Amex Commodities Clearing Corporation, Plaintiffs,**

v.

**The COMMODITY FUTURES TRADING COMMISSION, Philip McBride Johnson, Chairman of the Commodity Futures Trading Commission, James M. Stone, Read P. Dunn, Jr. and David G. Gartner, Commissioners of the Commodity Futures Trading Commission, Defendants.**

No. 81 Civ. 5665.

United States District Court,
S. D. New York.

Jan. 5, 1982.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiffs; Arthur L. Liman, Robert S. Smith, Anne Louise Oates, New York City, of counsel.

Dennis A. Dutterer, Gen. Counsel, Pat G. Nicolette, Deputy Gen. Counsel, Gregory C. Glynn, Associate Gen. Counsel, Joan L. Loizeaux, Sp. Counsel, Paul M. Architzel, Elizabeth M. Knoblock, Attys., Commodity Futures Trading Commission, Washington, D. C., Anthony J. Costantini, Regional Counsel, Eastern Regional Headquarters, Commodity Futures Trading Commission, New York City, for defendants.

## OPINION

EDWARD WEINFELD, District Judge.

This is an action by the American Stock Exchange Inc. and its wholly owned subsidiary, Amex Commodities Clearing Corporation (collectively "Amex"), to declare null and void regulations adopted by the defendants, the Commodity Futures Trading Commission and its members (collectively "Commission"), which authorized a pilot program for the trading of options on commodity futures contracts on domestic commodity exchanges, designated by the Commission as contracts markets for option trading. The matter is now before the Court on Amex's application for a preliminary injunction restraining the Commission from implementing and enforcing the regulations and on the Commission's cross-motion to dismiss the complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction and Rule 12(b)(6) thereof for failure to state a claim upon which relief can be granted. Amex seeks relief essentially upon a charge that it will be excluded from participation if the pilot program is allowed to become operational and it will suffer irreparable injury, since it is highly likely that it will be effectively barred from competing in the commodity options market unless the program provides for the simultaneous inclusion of options on physical commodities. The precise claim of irreparable injury and the basis of attack upon the regulations as an arbitrary measure is discussed in greater detail hereafter.

A proper understanding of the respective contentions of the parties requires a reference to the statutory history governing commodities options and commodities futures contracts. In 1936 Congress, concerned with a record of excessive price movements and severe disruptions in the futures markets attributable to speculative trading in options, prohibited option trading in certain agricultural commodities by the Commodity Exchange Act of 1936 ("1936 Act").[1] However, in the years that followed the passage of the 1936 Act, from 1936 to 1974, options in other commodities

---

**1.** Commodity Exchange Act of 1936, ch. 545, § 5, 49 Stat. 1494 (current version at 7 U.S.C. § 6c (1980)).

not enumerated in the 1936 Act were sold without any regulatory safeguards. During this period, there were widespread abuses and massive frauds by unscrupulous firms and others, as a result of which customers who had purchased such unregulated options were defrauded of millions of dollars.[2] In 1974 Congress, in an effort to remedy these abuses, enacted the Commodity Futures Trading Commission Act ("1974 Act")[3] which significantly amended the 1936 Act. The 1974 Act established the Commodity Futures Trading Commission, the defendant herein, as an independent regulatory agency with plenary rule-making power and delegated nearly unfettered authority to the Commission to regulate, or indeed ban, the trading in commodity options and commodity futures contracts in the United States.[4] The 1974 Act continued the absolute ban on option trading for commodities listed in the 1936 Act[5] but granted the new Commission exclusive authority to regulate and permit other options to be written and traded in compliance with rules to be promulgated by the Commission.[6] However, continued fraudulent and abusive practices under the Commission's interim rules prompted Congress by the Futures Trading Act of 1978 ("1978 Act")[7] to extend the ban of option trading to those commodities which first became subject to regulation in 1974. Directly pertinent to the issues presented here is that Congress further provided that such ban continue until the Commission submitted to the designated House and Senate oversight committees (1) documentation of its ability to regulate successfully such transactions, including its proposed rules and regulations, and (2) the expiration of thirty calendar days of continuous session of Congress after the date of transmittal.[8]

A proposed rule for trading in commodity options has been the subject of study by the Commission and its staff over a long period.[9] In 1977, the Commission proposed rules for a limited program permitting exchange trading of options on futures[10] and options on physicals[11] but no action[12] was taken and the matter of trading in options was the subject of further study by the Commission. In June 1981, it published for

2. *See, e.g.,* H.R.Rep. No. 975, 93d Cong., 2d Sess. 37–38, 48 (1974).

3. Pub.L. No. 93–463, 88 Stat. 1389.

4. *British American Commodity Options Corp. v. Bagley,* 552 F.2d 482, 486 (2d Cir.), *cert. denied,* 434 U.S. 938, 98 S.Ct. 427, 54 L.Ed.2d 297 (1977); *Commodity Futures Trading Comm'n v. Crown Colony Commodity Options, Ltd.,* 434 F.Supp. 911, 914 (S.D.N.Y.1977).

5. 7 U.S.C. § 6c(a) (Supp. V 1975).

6. 7 U.S.C. § 6c(b) (Supp. V 1975).

7. Pub.L. No. 95–405, 92 Stat. 865.

8. 7 U.S.C. § 6c(c) (1980).

9. There are two principal methods of trading commodities:
(1) traders on a futures exchange may enter into contracts in a form prescribed by the futures exchange, to buy or sell a commodity for future delivery—this method is known as the trading in futures; or (2) traders may buy or sell, or contract to buy or sell, physical commodities—this method is known as the trading in physicals. Both methods are suitable for option trading. A commodity option is a contractual right to buy or sell either a physical commodity ("option on physicals") or a commodity futures contract ("option on futures") by some specific date at a specified price. However, an option is not an obligation to buy, or sell, and if not exercised, the only loss to the option holder is the price paid for the option. An option on a physical permits the option holder to take delivery of the underlying commodity at any time of his choosing during the life of the contract. In contrast, options on futures contracts provide for such delivery only in the futures contract delivery month and then at a time chosen by the seller. 46 Fed.Reg. 54500, 54501 (Nov. 3, 1981); complaint, Exh. B at 4; *see British American Commodity Options Corp. v. Bagley,* 552 F.2d 482, 484–85 (2d Cir.), *cert. denied,* 434 U.S. 938, 98 S.Ct. 427, 54 L.Ed.2d 297 (1977); *Commodity Futures Trading Comm'n v. Crown Colony Commodity Options, Ltd.,* 434 F.Supp. 911, 913–19 (1977).

10. 42 Fed.Reg. 18246 (April 5, 1977).

11. 42 Fed.Reg. 55538 (Oct. 17, 1977).

12. Before the proposed rules could be adopted, the Commission, as noted above, suspended the offer and sale of commodity options because of pervasive fraud and unsound practices. 43 Fed.Reg. 16153 (April 17, 1978).

comment the proposed rules at issue here to establish a three-year pilot program to determine whether, and in what manner, exchange option trading should be permitted. This proposal was more restrictive than that considered in 1977. Under the proposal, the pilot program would be limited to options on futures contracts and participation would be restricted to those exchanges which have active, liquid markets in the underlying futures contracts.[13]

While the Commission was of the view that priority should be given to regulations permitting trading of commodity options involving futures contracts, it invited comments regarding the expansion of the pilot program to include options on physical commodities.[14] Among others, Amex responded and urged upon the Commission that it not exclude options on physical commodities from its pilot program setting forth in great detail its reasons in a sixteen-page letter, much of which was a repeat of representations made with respect to the 1977 proposed regulation. Essentially, the hard thrust of its position is that options on physicals and options on futures are financial instruments that are very close economic substitutes. Indeed, Amex urged that options on physicals would be preferable to options on futures contracts for both economic and regulatory reasons.[15] The Commission apparently was not persuaded by the arguments advanced by Amex and others and on September 8, 1981 adopted the proposed regulation. It was submitted to the oversight committees of the House[16]

and Senate[17] before whom the Chairman of the Commission and the staff personnel appeared and explained the regulatory approach, including the reasons for not including options on physicals. While the oversight committees had no power to veto the proposal, no adverse action was noted or taken. On November 3, 1981, the final rule was published in the Federal Register[18] and became effective on December 3, 1981.

Amex seeks to enjoin the enforcement of the new regulation until further regulations are adopted to provide simultaneous commencement of trading options on physicals. Amex asserts three specific claims: (1) that the adoption of the regulation was arbitrary, capricious and an abuse of discretion contrary to the best interests of the public and contrary to the intent of Congress and, therefore, in excess of the Commission's statutory authority; (2) that the regulations are anticompetitive and in contravention of section 15 of the 1936 Act[19] which requires the Commission in adopting new rules or regulations to endeavor to take the least anticompetitive means, thereby constituting an act in excess of the Commission's statutory authority; and (3) that the denial to plaintiffs of the opportunity to sell options on physical commodities while permitting other exchanges to sell an alleged competing product—options on commodities futures—constitutes wrongful deprivation of their property in violation of due process and denies them the equal protection of the laws in violation of the Fifth Amendment of the United States Constitution.

---

**13.** 46 Fed.Reg. 33293 (June 29, 1981).

**14.** *Id.* at 33294–95.

**15.** When exercised, options on physicals lead to the delivery of the physical commodity itself; thus they are "first derivative" instruments but one step removed from the underlying commodity. Options on futures are "second derivative" instruments which give rise only to delivery of a futures contract, a contractual undertaking which can be transferred to third parties to buy or sell a fixed amount and grade of a certain commodity on some specified date. Amex advances this difference as a factor favoring physicals over futures in the marketplace. Plaintiffs' brief at 9–10; affidavit of Nathan Most, ¶ 11.

**16.** Briefing by Commodity Futures Trading Commission. Sub-committee on Conservation, Trade and Rural Development of the Committee on Agricultural Research, House of Representatives, Sept. 23, 1981 (hereafter "House Briefing").

**17.** Briefing by Commodity Futures Trading Commission. Sub-committee on Agricultural Research and General Legislation, United States Senate, Oct. 14, 1981 (hereafter "Senate Briefing").

**18.** 46 Fed.Reg. 54500 (Nov. 3, 1981).

**19.** 7 U.S.C. § 19 (1980).

In order to prevail on the motion for preliminary injunctive relief, Amex must show not only irreparable injury but, in addition, likelihood of success on the merits or that there are sufficiently serious questions going to the merits to make them a fair ground of litigation and a balance of hardships tipping decidedly towards it.[20]

First, we consider Amex's claim for preliminary injunctive relief. This rests in the main upon a contention, variously and strenuously stated, that authorizing options on futures to go forward under the pilot program without at the same time including options on physicals will, because the two types of options are closely related products, "grant an overwhelming competitive advantage to those few exchanges initially permitted to trade in options on futures" and present "a nearly insurmountable obstacle to the successful implementation of trading of options on physicals" at a later time because traders will prefer an already established liquid market.[21]

The self-deprecation by Amex of its ability to compete as a subsequent entrant into an existing market wherein, as phrased by it, those who are permitted to trade in options on futures will have a decided headstart, is far from persuasive. Plaintiffs' dire prediction of anticompetitive consequences is a far cry from the much vaunted boast of private enterprise's capacity to enter into an existing market already dominated by others. A newcomer's entry into a strongly competitive market with the capacity to survive and exist is not unknown in our private enterprise system. Indeed, if as Amex argues, options on physicals are a more desirable product than options on futures, any headstart in favor of those trading in options on futures should prove no obstacle to those who desire to trade in options on physicals, whenever, and if, the Commission decides to authorize such trading.

Moreover, the claim of immediate irreparable injury because the Commission "will act to designate contract markets for trading in options on futures ... and trading will begin soon thereafter" is more apparent than real and is greatly diminished by the factual situation. While the effective date of the regulation under attack is December 3, 1981, it is not self-operative. Before an exchange may begin trading options, it must apply to the Commission for designation as a contract market to trade the underlying futures contracts and any applications that are submitted must be reviewed by the Commission to determine compliance with the pilot program.[22] The Chairman of the Commission, in his briefing of the Congressional committees, stated that he did not expect the pilot program to become operational until the summer of 1982 and that significant trading would not begin until 1983, because the first year would be spent reviewing the proposed applications and getting the system into place.[23] Further, the Commission in confining the regulation at the start to options on futures did not foreclose consideration of extending the rule to include options on physicals. Quite to the contrary, it stated that it had under consideration the issues raised with respect to the inclusion of options on physicals and that it would "make every effort to resolve these regulatory issues in time to inaugurate trading in options on physical commodities when trading in options on futures contracts begins."[24]

The mere fact that plaintiffs must wait until the Commission decides whether the pilot program shall include physicals does not stamp its rule as unreasonable, arbitrary or capricious. Under all the circum-

---

**20.** *Union Carbide Agr. Products Co. v. Costle,* 632 F.2d 1014, 1017 (2d Cir. 1980), *cert. denied,* 450 U.S. 996, 101 S.Ct. 1698, 68 L.Ed.2d 196 (1981); *Jack Kahn Music Co. v. Baldwin Piano & Organ Co.,* 604 F.2d 755, 758 (2d Cir. 1979).

**21.** Affidavit of Nathan Most, ¶¶ 3, 11; affidavit of William L. Silber, ¶¶ 7, 10; plaintiffs' affidavit and brief in support of motion, *passim.*

**22.** Commission Rules 33.4 and 33.5, 46 Fed. Reg. 54530–31.

**23.** Senate Briefing at 18; House Briefing at 30–31.

**24.** 46 Fed.Reg. at 54501.

stances, the claim of irreparable injury in support of a preliminary injunction rests upon conjectural, speculative and unrealistic grounds. However disappointed plaintiffs may be that options on physicals are not presently included in the pilot program, there has been no showing of irreparable injury to warrant intervention by the Court to stay the present regulation. The Court, in consideration of the cross-motion made by the Commission to dismiss, as hereafter noted, concludes that plaintiffs have failed to state a claim upon which relief can be granted from which it necessarily follows that Amex has also failed to establish a likelihood of success upon the merits.

### Motion to Dismiss

Whether the complaint states a cause of action on which relief could be granted, presents a question of law.[25] Plaintiffs, to prevail upon their complaint, have the burden to establish their claim that the rule was "arbitrary and capricious." The standard for review of final agency action is section 706 of the Administrative Procedure Act which provides that the "reviewing court shall ... hold wrongful and set aside agency action, findings, and conclusions" found to be "arbitrary, capricious and an abuse of discretion, or otherwise not 'in accordance with law"[26] or if the action failed to meet statutory, procedural or constitutional requirements. To make such a finding, the Court must take into account all relevant factors and decide whether there has been a clear error of judgment. Although this inquiry into the facts is to be

searching, careful and an in-depth review, the Court is not empowered to substitute its judgment for that of the agency; rather, the Court's inquiry is to determine whether the agency's decision is rational—the result of reasoned decisionmaking.[27] On this motion, the Court has before it a full administrative record, the briefing by the Commission of the House and Senate oversight committees, as well as comments that were received from interested parties, including those from Amex. Thus the validity of the Commission's actions stands or falls upon this record which contains the underlying reasons for its determination.[28]

The rule was not a rush to judgment. When initially proposed in broader terms in 1977 and again in June 1981 in more restricted form, the Commission invited comments from interested parties. As already noted, Amex pressed for inclusion of physicals in the rule. Its position was the subject of correspondence between it and the Commission. In reaching its decision, a number of factors tilted the scale in favor of embarking on the three-year pilot program initially limited to options on futures. The reasons which underlay the Commission's actions were stated by the Chairman of the Commission before the House and Senate oversight committees. In substance, the Commission was of the view that there was greater ease of regulation of options on futures since it was familiar and experienced with futures markets and futures contracts; that most of the fundamental features of the pilot program could readily

**25.** *Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946). The Court finds that defendants' motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction is without substance. The challenged regulation constitutes "final agency action" under § 10 of the Administrative Procedure Act, 5 U.S.C. § 704, and so is subject to judicial review. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967); *Central Hudson Gas & Electric Corp. v. E.P.A.*, 587 F.2d 549, 558 (2d Cir. 1978).

**26.** 5 U.S.C. § 706(2) (1977).

**27.** *See Citizens To Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416–17, 91 S.Ct. 814,

823–24, 28 L.Ed.2d 136 (1971); *Hooker Chemicals & Plastics Corp. v. Train*, 537 F.2d 620, 630 (2d Cir. 1976); *Dopico v. Goldschmidt*, 518 F.Supp. 1161, 1180 (S.D.N.Y.1981).

**28.** *Industrial Union Dep't v. American Petroleum Inst.*, 448 U.S. 607, 631 & n.31, 100 S.Ct. 2844, 2858 & n.31, 65 L.Ed.2d 1010 (1980) (plurality); *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 549, 98 S.Ct. 1197, 1214, 55 L.Ed.2d 460 (1978); *Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *National Nutritional Foods Ass'n v. Matthews*, 557 F.2d 325, 333 (2d Cir. 1977).

be "folded into" existing programs governing futures trading.[29] On the other hand, it was felt that options on physicals presented significantly different problems, particularly because the sponsoring exchange would be a stock exchange with which the Commission had no experience and over which it had no supervisory powers.[30] As stated by the Commission's Director, Division of Trading and Marketing at an open meeting of the Commission, "it takes a long time to designate a new exchange. It doesn't take nearly as much time to add an option contract to an already existing contract market."[31] Another factor was the limited resources available to the Commission, particularly in light of the prospect of a reduced budget under the current Administration's policy thereby affecting the availability of supervision and enforcement personnel in two of the three pilot years.

In its June 1981 published rule proposal, the Commission also noted that there were a number of issues unique in regulating options on physicals and solicited comment thereon. These issues centered about the type of regulatory framework to be established for trading options on physicals and the interaction between a market for options on physicals and a market for options on futures.[32] An important but unresolved issue as to which there was a difference of opinion was whether options on futures and options on physicals were fungible. Thus, in its final publication, the Commission addressed this issue as follows:

> The Commission has not determined as a matter of policy that options on physical commodities and options on futures contracts are competitively fungible or that they need to begin trading at the same time for competitive reasons. Nevertheless, the Commission will make every effort to resolve these regulatory issues in time to inaugurate trading in options on

physical commodities when trading in options on futures contracts begins.[33]

The Commission's decision, in launching the pilot program, that "priority should be given to adopting and implementing regulations which will permit trading of options for future delivery"[34] is geared to its capacity effectively to supervise such a program within its competence and experience in regulating futures markets and within its budgetary resources. As already noted, commodity option trading is banned until the Commission transmits to the designated House and Senate committees "*documentation of its ability to regulate successfully such transactions.*"[35] Thus the Commission is empowered to determine for itself whether it has the ability to regulate any program to lift the ban on any commodity trading so that the regulations will provide adequate protection to the public against the kind of pervasive fraudulent activities of the late 1960s and early 1970s which led to the imposition of the ban by both the Congress and the Commission. In promulgating the challenged rule, the Commission specifically articulated its reasons in limiting the scope of the pilot program. Among these was its "concern that such a limitation might be necessary to ensure that the public would be adequately protected from the abuses which, in the past, often were associated with the offer and sale of commodity options."[36] Its decision to limit the program to options on futures because it did not have the supervisory resources and regulatory framework needed to provide adequate protection of investors that inclusion of options on physicals would entail is a responsible exercise of its judgment. Its determination that it can only meet this legislative mandate by adopting a step-by-step approach limiting its scope of the regulations at this time to options on futures and deferring further consideration of op-

---

**29.** House Briefing at 9.

**30.** Senate Briefing at 15, 21–22, 28.

**31.** Commission Meeting, Sept. 8, 1981 at 61.

**32.** 46 Fed.Reg. at 33293.

**33.** 46 Fed.Reg. at 54501.

**34.** *Id.*

**35.** 7 U.S.C. § 6c(c) (1980) (emphasis supplied).

**36.** 46 Fed.Reg. at 54500.

tions on physicals was clearly within the grant of its authority.[37] It has exercised a cautious judgment; it has made a reasoned judgment.

The Commission's decision to proceed first with options on futures does not give rise to a correlative right in any other exchange or person to compel the inclusion in the regulations of options on physicals, nor is this distinction arbitrary or irrational so as to amount to, as plaintiffs contend, a constitutional violation either of their due process or equal protection of the laws rights.[38]

Amex further contends that the regulations are anticompetitive and that the Commission failed to properly "take into consideration the public interest to be served by the antitrust laws and endeavor to take the least anticompetitive means of achieving the objectives" of the Commodity Exchange Act as required by the statute.[39] As noted above, however, the Commission restricted the pilot program to options on futures because it concluded that options on physicals may present unique regulatory problems requiring a "somewhat different framework of regulation"[40] and that at this time "the only means ... whereby [it could] reasonably be confident" that it could protect the public from the types of massive frauds that had pervaded the history of commodity options trading was to so limit the program.[41] The Commission's published explanation of its decision demonstrates that it satisfied its obligation to endeavor to take the least anticompetitive means consistent with achieving its statutory purpose of lifting the ban on option trading only to the extent that it can effectively protect the public.

In the light of the fully documented record, the claims of constitutional and statutory violations of plaintiffs' rights are without substance; to grant the plaintiffs' application would be tantamount to substituting this Court's judgment for the reasoned and considered decision of the Commission.

The plaintiffs' motion for preliminary injunctive relief is denied. The defendants' motion to dismiss the complaint is granted.

So ordered.

---

**37.** As Senator Walter Huddleston noted in proposing the statutory ban of commodity options trading in 1978:

[The responsible course of action] is to prohibit options trading until such time as the Commission can justify to Congress its ability to successfully regulate these transactions.... The Commission may choose to single out individual commodities, or exchanges that it feels it can successfully regulate under an options program and transmit its justification for that proposal.

124 Cong.Rec. 35 (daily ed., Jan. 19, 1978).

**38.** *See City of New Orleans v. Dukes*, 427 U.S. 297, 303–06, 96 S.Ct. 2513, 2516–18, 49 L.Ed.2d 511 (1976); *Williamson v. Lee Optical Co.*, 348 U.S. 483, 487–88, 75 S.Ct. 461, 464–65, 99 L.Ed. 563 (1955).

**39.** 7 U.S.C. § 19 (1980).

**40.** 46 Fed.Reg. at 54571.

**41.** 46 Fed.Reg. at 54502.